# 24-177

## In the
# United States Court of Appeals
## For the Second Circuit

◆

TOWN OF BABYLON, NY, TOWN OF BROOKHAVEN, TOWN OF HEMPSTEAD, NY, TOWN OF ISLIP, NY, TOWN OF OYSTER BAY, TOWN OF NORTH HEMPSTEAD, NY, TOWN OF HUNTINGTON, NY, TOWN OF RAMAPO, NY AND TOWN OF SMITHTOWN, NY,

*Plaintiffs-Appellants,*

— v. —

LETITIA JAMES,
in her Official Capacity as the Attorney General for the State of New York,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

FREEDMAN NORMAND FRIEDLAND LLP
*Attorneys for Plaintiffs-Appellants*
99 Park Avenue, 19th Floor
New York, New York 10016
(646) 350-0527

NATHAN A. HOLCOMB, ESQ. PC
*Attorneys for Plaintiffs-Appellants*
125 Park Avenue, 25th Floor
New York, New York 10017
(646) 819-0303

TATE LAW GROUP, LLC
*Attorneys for Plaintiffs-Appellants*
25 Bull Street, 2nd Floor
P.O. Box 9060
Savannah, Georgia 31412
(912) 234-3030

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF ISSUES ......................................................................... 1

STATEMENT OF THE CASE ..................................................................... 2

    A.    The Opioid Crisis ..................................................................... 3

    B.    The Devastating Effect Upon the Towns ................................. 5

    C.    The Towns' Lawsuit Against Opioid Producers and Distributors ........ 8

    D.    The State of New York Facilitates Its Own Settlement Through Enactment of Senate Bill 7194 ........................................ 9

    E.    Procedural History .................................................................. 12

SUMMARY OF ARGUMENT .................................................................. 13

STANDARD OF REVIEW ....................................................................... 15

ARGUMENT ............................................................................................ 15

I.    THE TOWNS HAVE CAPACITY TO SUE THE STATE ........................... 15

    A.    A New York Municipal Corporation Has Distinct Governmental and Proprietary Capacities. ....................... 15

    B.    The General Prohibition on Suits by Towns Against The State is Subject to the Proprietary-Interest Exception. ................. 17

    C.    The District Court Erred by Limiting the Proprietary-Interest Exception to Cases Where the Plaintiff Has a Statutory Entitlement to Specific Funds. ....................................... 20

i

II.   THE TOWNS HAVE STANDING UNDER THE UNITED STATES
      CONSTITUTION ............................................................................24

      A.    The Towns Have Article III Standing. ................................................24

      B.    The Towns Have Standing to Bring Their Constitutional Claims. .....25

      C.    More Recent Supreme Court Precedents Have Permitted
            Municipalities to Bring Fourteenth Amendment Claims Against
            Their States. ...................................................................................27

      D.    The Towns May Bring Fourteenth Amendment Claims in Their
            Proprietary Capacities. ...................................................................30

CONCLUSION ....................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aguayo v. Richardson*,
    473 F.2d 1090 (2d Cir. 1973) ................................................. 26, 27, 35

*Beneke v. Town of Santa Clara*,
    28 A.D.3d 998 (3d Dep't 2006) ........................................................17

*City of New Rochelle v. Town of Mamaroneck*,
    111 F. Supp. 2d 353 (S.D.N.Y. 2000) .................................................33

*City of New York v. Richardson*,
    473 F.2d 923 (2d Cir. 1973) .............................................................26

*City of New York v. State of New York*,
    86 N.Y.2d 286 (1995) ........................................................... 13, 15, 19

*City of Trenton v. State of New Jersey*,
    262 U.S. 182 (1923) ......................................................................35

*Cty. of Albany v. Hooker*,
    204 N.Y. 1 (1912) .................................................................. passim

*Cty. of Rensselaer v. Regan*,
    80 N.Y.2d 988 (1992) ............................................................. 19, 23

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938) ........................................................................32

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960) ................................................................ passim

*Hunter v. City of Pittsburgh*,
    207 U.S. 161 (1907) ........................................................ 14, 24, 31, 32

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
    30 N.Y.3d 377 (2017) ............................................................. 20, 24

*Kerr v. Polis*,
    20 F.4th 686 (10th Cir. 2021) ..........................................................35

*Matter of City of New York v. Lawton*,
   128 A.D.2d 202 (3d Dep't 1987) ........................................................21

*Matter of Town of Moreau*,
   142 A.D.2d 864 (3d Dep't 1988) ...................................... 19, 20, 21, 23

*Owen v. City of Indep.*,
   445 U.S. 622 (1980) ........................................................................33

*Palmer v. Amazon.com, Inc.*,
   51 F.4th 491 (2d Cir. 2022) ............................................................15

*Purcell v. Regan*,
   126 A.D.2d 849 (3d Dep't 1987) ......................................................21

*Rogers v. Brockette*,
   588 F.2d 1057 (5th Cir. 1979) ................................................... 26, 33

*Romer v. Evans*,
   517 U.S. 620 (1996) ................................................................. 14, 29

*Sonterra Cap. Master Fund Ltd. v. UBS AG*,
   954 F.3d 529 (2d Cir. 2020) ............................................................25

*Town of Black Brook v. State*,
   41 N.Y.2d 486 (1977) ......................................................................19

*Tweed-New Haven Airport Auth. v. Tong*,
   930 F.3d 65 (2d Cir. 2019) ........................................................ 28, 30

*Washington v. Seattle School Dist. No. 1*,
   458 U.S. 457 (1982) ........................................................................29

*Williams v. Mayor & City Council of Baltimore*,
   289 U.S. 36 (1933) .................................................................... 27, 35

## Other Authorities

Fed. R. App. P. 4(a)(1) ........................................................................1

Josh Bendor, *Municipal Constitutional Rights: A New Approach*,
   31 Yale L. & Pol'y Rev. 389 (2013) ................................................32

Kathleen S. Morris, *The Case for Local Constitutional Enforcement*,
47 Harv. C.R.-C.L. L. Rev. 1 (2012)........................................................32

N.Y. Const. art. X, § 4 ............................................................ 17, 22, 33

N.Y. Town Law § 2 ........................................................................17

New York Mental Hygiene Law § 25.18(d) ........................................12

## JURISDICTIONAL STATEMENT

This appeal is from a December 20, 2023 final judgment of the U.S. District Court for the Eastern District of New York that disposed of all claims in their entirety. This Court has jurisdiction under 28 U.S.C. § 1291. The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiffs'[1] pleadings raised claims arising under the Federal Constitution. Plaintiffs' notice of appeal was timely filed on January 17, 2024, within 30 days of the judgment. Fed. R. App. P. 4(a)(1).

## STATEMENT OF ISSUES

1) Did the District Court err in holding that the plaintiff Towns lacked capacity to bring claims against the State of New York arising from legislation purporting to extinguish valuable legal claims that the Towns were pursuing in their proprietary capacities—not their governmental capacities—to recover compensation for their own financial losses?

2) Did the District Court err in holding that the plaintiff Towns lacked standing to bring Fourteenth Amendment claims against the State of New York notwithstanding the fact the fact that the State had purported to

---

[1] Plaintiffs are the Town of Babylon, NY, Town of Brookhaven, NY, Town of Hempstead, NY, Town of Islip, NY, Town of Oyster Bay, NY, Town of North Hempstead, NY, Town of Huntington, NY, Town of Ramapo, NY, and the Town of Smithtown, NY (collectively, the "Towns").

extinguish valuable legal claims that the Towns were pursuing in their proprietary capacities—not their governmental capacities—to recover compensation for their own financial losses?

## STATEMENT OF THE CASE

This case calls for the Court to apply rarely litigated principles of constitutional law to unprecedented facts. It arises from a highly unusual New York State statute that operated to retroactively extinguish valuable damages claims that the plaintiff Towns in New York State (Babylon, Brookhaven, Hempstead, Islip, Oyster Bay, North Hempstead, Huntington, Ramapo, and Smithtown) had brought against the producers and distributors responsible for the opioid crisis. The statute stopped the Towns' in-progress litigation dead in its tracks. Meanwhile, it arbitrarily permitted the equivalent claims brought by Nassau and Suffolk Counties to proceed.

Crucially, the Towns brought the claims at issue here in their proprietary capacities to recover *their own financial losses*. If allowed to continue, the Towns' claims would have yielded recoveries of unrestricted funds for the Towns to put to any use they deemed appropriate. In other words, the Towns' claims were no different from the claims any private plaintiff can bring. Based on these facts, as alleged in the Towns' operative pleading, the State of New York's purported extinguishment of the Towns' claims was constrained by the same principles of

federal constitutional law that apply to a private party. The State of New York cannot evade review of its statute by invoking the fiction that there is actually no case or controversy here at all because the State sits on both sides of "v." The District Court's contrary reasoning is unsound and requires reversal.

### A.    The Opioid Crisis

As alleged in the Towns' Fourth Amended Complaint ("FAC"), prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet as well as generic forms of oxycodone and hydrocodone, are narcotics. They are derived from, or possess properties similar to, opium and heroin, and are regulated as controlled substances. Opioids can relieve pain; they can also create a euphoric high. As a result, they are highly addictive. Sufficient doses can slow the user's breathing, causing respiratory depression and death. (JA–18, ¶ 23.)

Prior to a sophisticated campaign by opioid producers and distributors, opioids were recognized as an effective treatment for short-term post-surgical and trauma-related pain, as well as for palliative care. Controlled studies were limited to short-term use and in managed settings (such as hospitals), where the risk of addiction and other adverse outcomes was much lower. Although opioid producers and distributors knew that the drugs were too addictive and debilitating for long-term use treating chronic non-cancer pain, they nevertheless plotted to

create a sea change in medical and public perception that would permit their use not just for acute and palliative care, but for long-term treatment of more common aches and pains like lower back pain, arthritis, and headaches. (JA–18–19, ¶ 24.)

Opioid producers and distributors accomplished this sea change by spending hundreds of millions of dollars to (a) develop and disseminate scientific and educational materials and advertising that misrepresented the benefits and risks of using opioids for long-term treatment of chronic pain; (b) deploy sales representatives who visited doctors and delivered misleading messages about opioid use; (c) recruit prescribing physicians as paid speakers in order to secure their "brand loyalty"; (d) fund and encourage selected doctors, known as "key opinion leaders," to publish misleading studies, deliver scripted and misleading talks, present deceptive continuing medical education programs, and otherwise promote opioid use; and (e) fund and assist seemingly neutral and credible professional societies and patient advocacy groups that developed educational materials and treatment guidelines urging doctors to prescribe opioids for long-term use in treating chronic pain. (JA–19, ¶ 25.)

These efforts were wildly successful in expanding opioid abuse. By 2012, health care providers were writing enough prescriptions for opioid painkillers to medicate every adult in America around the clock for a month. Twenty percent of all doctors' visits in 2010 resulted in an opioid prescription, nearly double the rate

4

in 2000. Formerly a niche drug, opioids became the most prescribed class of drugs. This generated billions of dollars in revenue for opioid producers and distributors. (JA–19, ¶ 26.)

The result has been catastrophic. According to the CDC, prescription opioid use contributed to more than 16,000 annual overdose deaths by 2010—by which time opioids accounted for 40% of drug-related emergency department visits and 40% of drug poisoning deaths. By 2014, nearly two million Americans were either abusing opioids or dependent on them. (JA–20, ¶ 27.)

Meanwhile, the dramatic increase in opioid prescriptions to treat chronic pain resulted in a population of addicts seeking the drugs. These addicts were prone to increasingly desperate tactics—including doctor-shopping, use of aliases, and crime—to satisfy their cravings. Rather than displacing heroin, opioids triggered a resurgence in its use. Because heroin produces a high similar to the high caused by prescription opioids, but is often cheaper, addicts who started on opioids often began to use heroin as well. The common result is a cycle of drug use and crime. (JA–20, ¶ 28.)

### B.    The Devastating Effect Upon the Towns

The opioid crisis has had a devasting effect on towns and villages throughout New York, including the Towns that are Plaintiffs in this action. (JA–20, ¶ 29.) The emergency medical services ("EMS"), fire departments, and police

departments operated by towns and villages typically have the main responsibility for providing the first responses to health emergencies and crimes. The opioid crisis has buried the towns' and villages' first responders under an avalanche of health emergencies and crimes, consuming their resources and diverting those resources from other priorities. (JA–20, ¶ 30.)

The Town of Brookhaven provides a representative example. Brookhaven is located in Suffolk County. Suffolk County does not provide, or fund, EMS. Instead, the Town of Brookhaven contracts with the Brookhaven Ambulance Co., Inc. (the "BAC") to provide EMS to its residents. The Town raises funds through its residents' property taxes; it then allocates a portion of the funds to support the BAC in providing EMS to Brookhaven's residents. The BAC is a not-for-profit corporation staffed largely by volunteers. (JA–20–21, ¶ 31.)

Prior to the opioid crisis, the typical medical emergencies to which the BAC was called to respond were things like chest pain and diabetic emergencies. In recent years, however, the BAC has been overwhelmed by emergencies caused by opioid addiction. Not only has the volume of emergency calls risen dramatically, but the resources required to respond to those calls has changed. (JA–21, ¶ 32.)

Employees and volunteers have required training on treating opioid overdoses and on the medications like Narcan that are used for such treatments.

The EMS services have had to acquire and maintain supplies of those medications. Opioid addicts can become violent when they are revived following an overdose. As a result, more personnel are required to respond to calls related to opioid overdoses, and those personnel require supplies such as ballistic armor for protection. (JA–21, ¶ 33.)

Responding to a huge volume of opioid-related emergencies takes an emotional toll on personnel, leading to burnout. Replacing personnel who quit requires an investment of resources in recruiting replacement personnel, and then a further investment of resources in training these replacement personnel. The BAC has also developed an educational program to raise awareness in the community about the dangers opiates pose. (JA–21, ¶ 34.)

All of this requires money, which the BAC has had to divert away from filling other needs, such as preparations for responding to other types of emergencies. The BAC has also delayed replacement of first emergency response utility vehicles (which have a replacement cost of approximately $100,000) and ambulances (which have a replacement cost of approximately $400,000). Delaying replacement of vehicles that otherwise would have been retired already is only a temporary solution. Saddled with an aging fleet, the BAC will inevitably face the need to replace vehicles whose usable life cannot be extended any longer without compromising safety. (JA–21–22, ¶ 35.)

The circumstances Brookhaven and the BAC have faced as a result of the opioid crisis are typical of those faced by the first responders from towns and villages throughout the State of New York, including the other Towns in this action. (JA–22, ¶ 36.)

## C. The Towns' Lawsuit Against Opioid Producers and Distributors

On December 10, 2019, the Towns (together with many other similarly situated plaintiffs) filed a complaint in the Supreme Court for the State of New York for Suffolk County. The Towns named multiple defendants involved in the production and distribution of opiate drugs, seeking to hold these defendants responsible for the financial harm the Towns had suffered as a result of the opioid crisis. The case was captioned as *Village of Amityville, et al. v. Teva Pharmaceuticals, et al.*, Index No. 400031/2019 (N.Y. Sup. Ct. Suffolk Cnty.) (the "State Court Action"). (JA–22, ¶ 37.)

The Towns' causes of action against the producer and distributor defendants included claims in the Towns' proprietary capacities—in other words, claims that were equivalent to the claims a private plaintiff can bring. At their core, those claims were based on the fact that the producer and distributor defendants, through conduct that was negligent and that also violated various statutory provisions, had caused the Towns tremendous financial harm. Through their lawsuit, the Towns sought to recover damages to compensate them for their

8

own financial harm. (JA–22, ¶ 38.)

Commensurate with the broad swathe the opioid crisis has cut across America, a large number of plaintiffs have brought claims against the same producer and distributor defendants. Other plaintiffs included the State of New York (together with many other states) and the Counties of Nassau and Suffolk (together with many other counties), as well as many other towns and villages situated similarly to the Towns in this case. (JA–22–23, ¶ 39.)

The many plaintiffs shared a common interest in discovering the full truth of the producer and distributor defendants' misconduct and holding them responsible. However, it was inevitable that conflicts among the various plaintiffs' interests would arise when it came time to apportion the recoverable assets of the producer and distributor defendants, which are vast but nevertheless finite. (JA–23, ¶ 40.)

This case arises from the conflict of interest that arose between, on the one hand, the Towns in this case and their similarly situated co-plaintiffs in the State Court Action and, on the other hand, the State of New York and the Counties of Nassau and Suffolk. (JA–23, ¶ 41.)

### D.   The State of New York Facilitates Its Own Settlement Through Enactment of Senate Bill 7194

During the summer of 2021, the State, acting through the Attorney

General's Office, was in the process of negotiating a settlement with certain distributor defendants and producer defendants. (JA–23, ¶ 42.) Then, on June 5, 2021, Bill No. 7194 was introduced in the New York Senate. The Bill was intended to facilitate the settlement discussions that were then underway. It contemplated the creation of an opioid settlement fund administered by the State. It also purported to extinguish some—but critically not all—of the claims by State "subdivisions" including "each county, city, town, village, or special district in the state of New York." (JA–23, ¶ 43.)

The relevant provision, since codified at § 25.18(d) of the New York Mental Hygiene Law, states as follows:

> Limitation on authority of government entities to bring lawsuits. No government entity shall have the authority to assert released claim against entities released by the department of law in a statewide opioid settlement agreement executed by the department of law and the released party on or after June first, two thousand twenty-one. Any action filed by a government entity after June thirtieth, two thousand nineteen asserting released claims against a manufacturer, distributor, or dispenser of opioid products shall be extinguished by operation of law upon being released by the department of law in such statewide opioid settlement agreement.

(JA–23–24, ¶ 44.)

The Bill thus operated to extinguish *some* pending claims retroactively—but not *all* such claims. The cutoff date of June 30, 2019, set an arbitrary line between the subdivisions whose claims would be extinguished and those whose

claims would survive. (JA–24, ¶ 45.)

When the Bill was introduced, it was plain to all which "subdivisions" the Bill would favor and which it would not, because it was a matter of public record which subdivisions had filed claims prior to the cutoff date and which had not. The Bill favored Nassau and Suffolk Counties (and, of course, their counsel). It did not favor the Towns in this case or their co-plaintiffs in the State Court Action. (JA–24, ¶ 46.)

Senate Bill No. 7194 was signed into law on June 29, 2021. Just three weeks later, on July 20, 2021, the State of New York, together with the Counties of Nassau and Suffolk, entered into a settlement with three distributor defendants. The settlement agreement specifically provided for payment of significant attorneys' fees to just two outside law firms (Napoli Shkolnik PLLC and Simmons Hanly LLC), which represented subdivisions that were, or were expected to be, "Participating Subdivisions." Nassau County and Suffolk County received settlements in cash, with no restriction on their use of the funds they received. (JA–24, ¶ 47.)

With the spoils thus divided, the Towns in this case (together with their co-plaintiffs in the State Court Action) are out of luck. Before enactment of Senate Bill No. 7194, the Towns were situated similarly to the State, the Counties of Nassau and Suffolk, and towns and villages throughout the State insofar as they

11

had valuable and timely-filed claims pending against the producer and distributor defendants. If Senate Bill No. 7194 were enforceable, it would mean that those valuable claims simply disappeared on June 29, 2021—while the claims of other "Participating Subdivisions" survived. This would leave Plaintiffs with no recovery from the producer and distributor defendants for the financial harm they have suffered as a result of those defendants' misconduct. (JA–24–25, ¶ 48.)

The consequences are real and they matter: the Towns will struggle to replace their aging fleets of EMS vehicles; they will struggle to fund efforts to recruit employees and volunteers; they will struggle to purchase the medications and equipment that those employees and volunteers need to serve on the front line of the battle against the opioid crisis; and with their coffers depleted by that battle, they will struggle in preparing to handle other emergencies. Those consequences will not be suffered similarly by the Counties of Nassau and Suffolk, whose coffers have been arbitrarily filled by the State. (JA–25, ¶ 49.)

### E. Procedural History

The Towns brought suit in the U.S. District Court for the Eastern District of New York against Defendant-Appellee Letitia James, in her official capacity as Attorney General for the State of New York (the "State"), seeking a declaration that the New York Mental Hygiene Law § 25.18(d) violated their rights under the federal and New York constitutions. The operative Fourth Amended Complaint

asserts claims for violations of the First and Fourteenth Amendments to the Federal Constitution as well as claims under Articles I, VIII, and IX of the New York Constitution. (JA–15–52.)

The Defendant-Appellee moved to dismiss. The District Court granted the motion, relying on two distinct grounds. (JA–53–87.) *First*, the District Court held that as a matter of New York state law, the Towns lacked the capacity bring their claims against the State. (JA–61–75.) *Second*, the District Court held that as a matter of federal constitutional law, the Towns lacked standing to bring claims arising under the Fourteenth Amendment against the State. (JA–76–80.) Having dismissed the Towns' federal claims, the District Court declined to exercise supplemental jurisdiction over their remaining state law claims. (JA–80–86.)

## <u>SUMMARY OF ARGUMENT</u>

*First*, the Towns have capacity to bring this lawsuit because the proprietary-interest exception to the general rule barring claims by a municipality against the State applies. The Towns' claims arise from State legislation that purported to extinguish their valuable claims for damages. What is at stake is their "proprietary interest in a fund or property," not any exercise of a governmental function. *City of New York v. State of New York*, 86 N.Y.2d 286, 295 (1995).

*Second*, the Towns have standing. They have plainly pled the Article III requirements of injury in fact, causation, and redressability. Supreme Court

precedent does not support a broad rule that municipalities are uniformly prohibited from bringing Fourteenth Amendment claim against their states. More recent Supreme Court decisions such as a *Romer v. Evans*, 517 U.S. 620 (1996), have permitted such claims to proceed. And from the very start of the line of cases upon which the District Court relied, the Supreme Court has acknowledged that because municipal corporations "are sometimes authorized to hold and do hold property for the same purposes that property is held by private corporations or individuals . . . *as to the latter class of property, the legislature is not omnipotent*." *Hunter v. City of Pittsburgh*, 207 U.S. 161, 179 (1907) (emphasis added). The Supreme Court has since acknowledged that "[t]he Hunter opinion itself intimates that a state legislature may not be omnipotent even as to the disposition of some types of property owned by municipal corporation." *Gomillion v. Lightfoot*, 364 U.S. 339, 344 (1960).

The State's position in this litigation is that the state legislature *is* omnipotent with respect to the disposition of property owned by a municipal corporation. That proposition is wrong according to the Supreme Court. The Towns respectfully submit that the District Court erred when it dismissed their claims as a matter of law. This Court should reverse.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's grant of a motion to dismiss under Rules 12(b)(1) and 12(b)(6), accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022).

## ARGUMENT

## I.   THE TOWNS HAVE CAPACITY TO SUE THE STATE

### A.   A New York Municipal Corporation Has Distinct Governmental and Proprietary Capacities.

As the District Court correctly recognized, "[p]ursuant to Fed. R. Civ. P. 17(b), the capacity of a governmental entity to sue or be sued is a question of state law." (JA–61 (quoting *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995).)

There are several recognized exceptions to the general rule under New York law that municipal corporations do not have capacity to challenge State legislation, including the "proprietary interest exception." *City of New York*, 86 N.Y.2d at 295. The District Court erred in holding that this exception does not apply here.

The foundational precedent of the New York Court of Appeals is *County of Albany v. Hooker*, 204 N.Y. 1 (1912). There, the court explained that the State's counties and towns "were, in effect, subdivisions of the governed territory,

established for the more convenient administration of government and having such powers as were necessary to be exercised for the welfare, advantage, and protection of the public within their boundaries." *Id.* at 12. At the same time, however, "[t]he counties and towns of this state were always bodies corporate for certain purposes, having been endowed with capacities to purchase and to hold real and personal property and to make contracts in reference thereto." *Id.*

With respect to the towns' and counties' "governmental and political powers and duties," the court explained that "[t]hey are not, in the exercise of such authority, subject to suit any more that the state itself, and certainly they cannot maintain an action against the state of whose sovereign power they are a part, or against state officers who are expressly charged with the performance of sovereign power." *Id.* at 9, 10. With respect to the "corporate powers," however, the court explained that "authority to sue and be sued as quasi corporations has been restricted to the county [or town] in its *corporate capacity as distinguished from its governmental and political capacity*." *Id.* at 12 (emphasis added).

The court traced the historical authority for the rights of counties and towns in their corporate capacities, including in particular the rights to hold property and to sue, through the Revised Statutes of 1829, the Constitution of 1846, the Constitution of 1894, and the Laws of 1892. *Id.* at 10–13. Today, New York's Town Law provides that "[a] town is a municipal corporation comprising the

16

inhabitants within its boundaries, and formed for the purpose of exercising such powers and discharging such duties of local government and administration of public affairs as have been, or, may be conferred or imposed upon it by law." N.Y. Town Law § 2. The New York Constitution in turn provides that "all corporations shall have the right to sue and shall be subject to be sued in all courts in like cases as natural persons." N.Y. Const. art. X, § 4; *see Beneke v. Town of Santa Clara*, 28 A.D.3d 998, 999 (3d Dep't 2006) ("[W]e note that the Town is a municipal corporation (*see* Town Law § 2) and, as a corporation, has the right to sue and be sued in all courts like a natural person (*see* N.Y. Const., art. X, § 4 . . .).")

### B. The General Prohibition on Suits by Towns Against The State is Subject to the Proprietary-Interest Exception.

*County of Albany* relied on the distinction between governmental and proprietary capacities to decide the question of whether the plaintiff county had the capacity to assert a claim against the members of the State Commission of Highways of the State of New York related to a 1911 statute that provided for the allocation of a funds raised through a bond issuance to the construction and improvement of state roads connecting certain New York counties. 204 N.Y. at 7–8. After reviewing several prior precedents, the court concluded that the county lacked capacity to challenge the statute at issue.

The court's reasoning on this issue is instructive. The court distinguished the authorities the county cited based on the fact that "each relate to funds or property of a municipal corporation in its possession or to which it had a right to immediate possession," whereas "[i]n the case now before us there is no fund or property mentioned in the complaint, the legal or equitable title of which is in the county." *Id.* at 16. Instead, "[t]he purpose of the action is to preserve the general and individual interests *of the taxpayers and inhabitants of the county* by requiring that public money be spend in the vicinity of their homes," which "has immediate reference to the control of a governmental and public work." *Id.* at 17 (emphasis added). The court concluded that "[w]ith no fund or property in existence, the title to which is in the county, and no funds or property in the possession of another to which the county is entitled to possession, and *the entire subject being one of governmental and public policy, independent of the corporate rights of the county*, the action cannot be maintained by the plaintiff[.]" *Id.* at 18 (emphasis added).

Following *County of Albany*, subsequent New York precedents have distinguished cases where a governmental interest of a municipal corporation is at issue from cases where a corporate or proprietary capacity is at issue. The cases where governmental interests are at stake establish the general rule that a town lacks capacity to sue the State, while the cases where corporate or proprietary interests are at stake establish the propriety interest exception to this rule.

18

Thus, in *Town of Black Brook v. State*, 41 N.Y.2d 486 (1977), the Court of Appeals explained that "[t]he general rule of law is that a political subdivision of the State may not challenge the constitutionality of an act of the State Legislature *restricting its governmental powers*." *Id.* at 488 (emphasis added); *accord Matter of Town of Moreau*, 142 A.D.2d 864, 865 (3d Dep't 1988). But among the "exceptions to the general rule barring local governmental challenges to State legislation" are "where the State legislation adversely affects a municipality's proprietary interest in a specific fund of moneys," or where the municipality has a "proprietary interest in a fund or property to which their claims relate." *City of New York*, 86 N.Y.2d at 291–292, 295. This articulation echoes the language of *County of Albany* referring to the need for a relation "to funds or property of a municipal corporation in its possession or to which it had a right to immediate possession" as a basis for capacity. 204 N.Y. at 16.

Notably, the language referring to a "specific fund of money" is a quotation of *County of Rensselaer v. Regan*, 80 N.Y.2d 988 (1992), in which the Court explained that it had "not previously endorsed that concept of standing" and that it was not "necessary for us to consider the validity of that concept today." *Id.* at 991. The holding in *County of Rensselaer* rested on the fact that the plaintiff had satisfied even this potentially narrower concept of standing. *Id.*

19

**C.** **The District Court Erred by Limiting the Proprietary-Interest Exception to Cases Where the Plaintiff Has a Statutory Entitlement to Specific Funds.**

The District Court placed an erroneous limitation on the proprietary-interest exception. Relying on language in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, 30 N.Y.3d 377 (2017), which in turn quoted *Matter of Town of Moreau*, the District Court held that it was a requirement for application of the proprietary interest exception that a plaintiff town be "vested with an entitlement to a *specific fund by statute*." (JA–65 (quoting *In re World Trade Center*, 20 N.Y.3d at 386).)

But *In re World Trade Center* did not hold that a statutory entitlement to a specific fund was a *necessary* requirement for application of the proprietary interest exception. It merely acknowledged, quoting *Matter of Town of Moreau*, that such an entitlement was *sufficient*. The quoted language is an artifact of the facts that the New York Appellate Division addressed in *Matter of Town of Moreau* and the authorities it distinguished. In that case, the plaintiff town had challenged the application of a tax law allocating revenue to various towns and counties, contending that it should have been allocated more. 142 A.D.2d at 865. Citing *County of Albany,* the court explained that it was insufficient for capacity that the town was seeking to recover a specific sum of money. *Id.* It emphasized that "petitioner's challenge is to the allocation of tax revenues, a fundamental

20

governmental function." *Id.* Finally, citing *County of Albany* once again, it concluded that "whether the fund being sought here is specifically identifiable is not dispositive of petitioner's standing to sue *for they have no immediate right to possess that fund*." *Id.* (emphasis added).

The court distinguished *Purcell v. Regan*, 126 A.D.2d 849 (3d Dep't 1987), and *Matter of City of New York v. Lawton*, 128 A.D.2d 202 (3d Dep't 1987), on the ground that in those cases "the local governments were vested with an entitlement to a specific fund by a statute which endowed them with a proprietary interest in the fund." *Id.* But it never held that such a statutory right was *required* for the proprietary interest exception to apply. As explained in *County of Albany*, what is required is "funds or property of a municipal corporation in its possession or to which it had a right to immediate possession." 204 N.Y. at 16. The court's reasoning shows that it relied on the facts that (1) the town was challenging a "fundamental governmental function," and (2) the town had "no immediate right to possess" the funds it sought. Given these facts, the court had no occasion to consider the question of whether a statutory entitlement was a prerequisite for application of the proprietary interest exception. *Matter of Town of Moreau*, 142 A.D.2d at 865.

This is not even a close case under *County of Albany* and its progeny. Simply put, the Towns had valuable legal claims for damages, just like the claims

21

that any private plaintiff could pursue. Under N.Y. Const. art. X, § 4, the Towns had the same right to pursue those claims "as natural persons." Section 25.18(d) of the New York Mental Hygiene Law purported to take those claims away. The Towns have capacity to challenge State legislation that took away the valuable legal claims they were pursuing in their proprietary capacity.

To hold that a statutory entitlement to funds is a prerequisite for application of the proprietary interest exception would turn *County of Albany* on its head, effectively overruling its acknowledgment that a town may pursue claims based on deprivation of "funds or property of a municipal corporation in its possession or to which it had a right to immediate possession." *Id.* at 16. It would privilege rights created by statute over the most fundamental rights a municipal corporation is afforded under the New York Constitution, including in particular the rights to hold property and to sue.

The consequences of holding that towns and counties have no capacity to sue to protect their basic rights to hold property and to sue would be far-reaching. If, for example, the State passed legislation transferring title to all property of any kind held by the City of New York, bank accounts and all, to the State, the City of New York would not have capacity to bring any claim. Or if the State passed legislation that transferred the title of a specific piece of property, such as Central Park, from the City of New York to the State for the purpose of building a State

prison, the City of New York would not have capacity to bring any claim. Or if the state passed legislation purporting to take away the constitutional right of municipal corporations to sue, no city or town would have capacity to challenge the legislation. These results are absurd and inconsistent with the foundational reasoning in *County of Albany*.

The common references to statutory entitlements in the case law are a function of that fact that the most frequently litigated cases are those that present closer questions as to where the dividing line between governmental interests and proprietary interests falls. A recurring fact pattern giving rise to such closer questions is where legislation creates a monetary fund serving governmental purposes for the benefit of multiple towns or counties and one town or county asserts a right to benefits from that fund. *See, e.g.*, *County of Rensselaer*, 80 N.Y.2d at 990–91; *County of Albany*, 204 N.Y. at 8–9; *Matter of Town of Moreau*, 142 A.D.2d at 865. Cases addressing this recurring fact pattern have held that a statute creating an entitlement to specific funds is *sufficient* for application of the proprietary-interest exception. But it is a mistake to infer that such a statutory entitlement is *necessary.* Doing so would gut municipal corporations' most basic proprietary interests in holding property and in suing, leaving those interests entirely subject to the State's whim to revoke them at any time. The absurd result would elevate the kinds of narrow statutory rights that can present close questions

23

as to the dividing line between governmental and proprietary interests over the most basic propriety rights guaranteed to municipal corporations in the New York Constitution.

Finally, the argument presented below in Section II—that, under the line of cases deriving from *Hunter v. City of Pittsburgh*, 207 U.S. 161 (1907), the Towns have standing to bring Fourteenth Amendment Claims in their proprietary capacities—reinforces the applicability of the proprietary-interest exception to New York's capacity rule. As the New York Court of Appeals acknowledged in *In re World Trade Center*, its "capacity rule is ultimately derived from a line of analogous federal cases sometimes referred to as the '*Hunter* cases'." 30 N.Y.3d at 386 n.4. The analyses of the Towns' capacity under New York law and their standing under federal constitutional law thus go hand in hand: where the Towns are bringing claims in their proprietary capacities to protect the same kinds of pecuniary interests that a private plaintiff has, they have both capacity and standing.

## II. THE TOWNS HAVE STANDING UNDER THE UNITED STATES CONSTITUTION

### A. The Towns Have Article III Standing.

The District Court purported to hold that the Towns lacked standing under Article III of the United States Constitution, but did not address the requirements

for Article III standing. (JA–75–76.) "To satisfy Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534 (2d Cir. 2020) (internal quotation and citation omitted). "To plead injury in fact, a plaintiff must allege that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical" and that "[a]ny monetary loss suffered by the plaintiff satisfies this requirement." *Id*. (internal quotation and citation omitted).

In the FAC, the Towns repeatedly allege that they have suffered a significant financial harm caused by the opioid producers and distributors and that the State robbed them of their ability to remedy this harm by extinguishing their right to sue the opioid producers and distributors and participate in the multi-billion dollar settlement fund, while the Counties of Nassau and Suffolk were arbitrarily allowed to share in the settlement fund. *See*, *e.g.*, JA–16–17, ¶¶ 4–7; JA–20–25, ¶¶ 30, 35, 39–40, 48–49. The Towns' allegations of financial harm satisfy the requirements of Article III.

### B. The Towns Have Standing to Bring Their Constitutional Claims.

The District Court based its standing analysis on precedents addressing the

circumstances in which a political subdivision of a state, including a town or county, may or may not bring a Fourteenth Amendment claim against its state.[2] In particular, the District Court relied on two decisions that this Court issued in 1973. In *City of New York v. Richardson*, 473 F.2d 923 (2d Cir. 1973), this Court stated that "[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." *Id.* at 929. And in *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973), this Court held that the plaintiff town "lack[ed] standing to assert constitutional claims against the State." *Id.* 1101. Supreme Court precedents issued both before and after this Court's 1973 decisions, as well as more the more recent precedent of this Court, make it clear that the Court should not endorse the District Court's broad applications of *City of New York v. Richardson* and *Aguayo*.

    *First*, the District Court failed to take account of more recent Supreme Court precedents, which have allowed municipalities to bring Fourteenth Amendment claims against their states. *Second*, the District Court failed to take account of the fact that the Towns have alleged claims in their proprietary capacities, and that even the older Supreme Court precedents acknowledged the

---

[2] Some courts have pointed out that under contemporary usage of the concept of standing, the issue is better understood as turning on the merits issue of whether the plaintiff has a claim rather than on the threshold requirement of standing. *See, e.g.*, *Rogers v. Brockette*, 588 F.2d 1057, 1070 (5th Cir. 1979).

distinction between claims a municipality may have in its governmental capacity and claims a municipality may have in its proprietary capacity.

### C. More Recent Supreme Court Precedents Have Permitted Municipalities to Bring Fourteenth Amendment Claims Against Their States.

In *Aguayo*, this Court relied on the Supreme Court's broad pronouncement in *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36 (1933), that "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." 473 F.2d at 1100 (quoting *Williams*, 289 U.S. at 40). *City of New York v. Richardson* in turn relied upon both *Williams* and *Aguayo* for its holding regarding the standing of city and county plaintiffs. 473 F.2d at 929.

However, Supreme Court authority subsequent to *Williams*, including authority cited by this Court in its decisions addressing the standing of municipal corporations, has chipped away at its broad rule. In *Gomillion*, the Supreme Court cautioned that its earlier precedents "are authority only for the principle that no constitutionally protected contractual obligation arises between a State and its subordinate governmental entities *solely as a result of their relationship*." 364 U.S. at 343 (emphasis added). Those precedents, the Court explained, fell into two discrete classes: "(1) those in which it is claimed that the State, by virtue of

the prohibition against impairment of the obligation of contract (Art. I, s 10) and of the Due Process Clause of the Fourteenth Amendment, is without power to extinguish, or alter the boundaries of, an existing municipality; and (2) in which it is claimed that the State has no power to change the identity of a municipality whereby citizens of a pre-existing municipality suffer serious economic disadvantage." *Id.*

Following *Gomillion*, courts have entertained suits brought by municipalities against their states that fall outside the discrete classes of challenges to alterations of municipal boundaries and identities. As this Court observed in *Tweed-New Haven Airport Authority v. Tong*, 930 F.3d 65 (2d Cir. 2019), "[i]n the years following *Gomillion*, the Supreme Court has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause." *Id.* at 73 (collecting authority).

Among the cases cited in *Tweed* where the Supreme Court decided a dispute between a state and a subdivision of the state were *Romer* and *Washington*. In both cases, political subdivisions challenged their respective states under the Fourteenth Amendment because state law sought to block their anti-discrimination measures. In *Romer*, plaintiffs including the cities of Denver and Aspen challenged a state constitutional amendment that barred local ordinances protecting the civil rights of gays, lesbians, and bisexuals. 517 U.S. at

28

623–24. In *Washington v. Seattle School District No. 1*, plaintiff school districts challenged a state law that prohibited their school busing desegregation plans. 458 U.S. 457, 462–64 (1982). In both cases, the Supreme Court struck down the challenged laws. *See Id.* at 487; *Romer*, 517 U.S. at 635–36.

The District Court pooh-poohed the Supreme Court's decisions in *Romer* and *Washington* as irrelevant to its standing analysis, reasoning that in both cases the plaintiffs included entities that were not political subdivisions, that the issue of standing was accordingly not dispositive, and that it was not raised or addressed. (JA–77–78 at n.4.) In neither case, however, did the Supreme Court overlook the role of the municipal plaintiffs. In *Romer*, the Supreme Court explicitly acknowledged that the "plaintiffs (also respondents here) included the three municipalities whose ordinances we have cited and certain other governmental entities which had acted earlier to protect homosexuals from discrimination." 517 U.S. at 625. And in *Washington*, Seattle School District No. 1 was the lead named plaintiff and respondent, and the Supreme Court noted that it had initiated the lawsuit "together with the Tacoma and Pasco School Districts"; only later did parties including the United States and various community organizations intervene to support the school districts' Equal Protection challenge to state legislation. 458 U.S. at 464.

29

If this were not enough to establish the precedential relevance of these Supreme Court precedents to issues of standing under the Fourteenth Amendment, this Court itself acknowledged that *Romer* and *Washington* were relevant to standing issues when it cited them in support of the proposition that "[i]n the years following *Gomillion*, the Supreme Court has repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause." *Tweed*, 930 F.3d at 73. While this Court did note its prior decisions in *Aguayo* and *City of New York v. Richardson* in a footnote and explained that the absence of a Fourteenth Amendment claim meant that *Tweed* raised different considerations, the Court clearly left the door open to revisiting the broad rules set forth in *Aguayo* and *City of New York v. Richardson* in light of intervening authority, including *Romer* and *Washington*. *Id.* at 73 n.7.

### D. The Towns May Bring Fourteenth Amendment Claims in Their Proprietary Capacities.

While more recent Supreme Court authority calls into question the continuing validity of the older Supreme Court precedents upon which the Attorney General relies, this Court need not go so far as to hold that the Supreme Court has overruled any of its precedents. The line of cases upon which the District Court relies traces back to *Hunter*, decided in 1907. There, the Court made pronouncements that are misleadingly broad when repeated out of context, noting

that "[m]unicipal corporations are political subdivisions of the state," and stating that with respect to such actions as revoking a municipal charter or taking municipal property, the state "may do as it will, unrestrained by any provision of the Constitution of the United States." *Hunter*, 207 U.S. at 178–79.

Immediately thereafter, however, the Court took pains to limit its holding, explaining that "in describing the absolute power of the state over the property of municipal corporations, we have not extended it beyond the property held and used for governmental purposes." *Id.* at 179. Acknowledging that municipal corporations "are sometimes authorized to hold and do hold property for the *same purposes that property is held by private corporations or individuals*," the Court observed that "it has been held that, *as to this latter class of property, the legislature is not omnipotent*." *Id.* (emphases added). The Court rejected the City of Allegheny's Fourteenth Amendment due process claim, not on the ground there could be no such claim, but simply because there was no "allegation that Allegheny had been deprived of its property without due process of law," and instead only allegations that "taxpayers . . . were deprived of the their property without due process law because of the increased taxation which would result from the annexation—an entirely different proposition." *Id.* at 180. Because "no question of the effect of the act upon private property rights of the city of Allegheny" was presented in the record before the Court, the Court stated that it

31

was "without jurisdiction to consider it." *Id.* at 181.[3]

The Supreme Court has acknowledged that "[t]he Hunter opinion itself intimates that a state legislature may not be omnipotent even as to the disposition of some types of property owned by municipal corporations." *Gomillion*, 364 U.S. at 344. It went on to explain that "the Court has never acknowledged that the States have power to do as they will with municipal corporations regardless of consequences." *Id.* "Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution." *Id.*

Similarly, the Fifth Circuit has recognized that the *Hunter* Court thus "went on to acknowledge, implicitly, that a municipality *could raise the claim that its 'private' contract and property rights had been impaired*," which "is, of course, *flatly inconsistent with the position that a municipality can never sue the state that*

---

[3] Scholarly commentary has persuasively argued that *Hunter* was effectively overruled by *Erie R. Co. v. Tompkins*, 304 U.S. 64, 75 (1938), because *Hunter*'s pronouncements on the nature of municipalities constituted "federal general common law" of the kind that *Erie* overruled. *See* Kathleen S. Morris, *The Case for Local Constitutional Enforcement*, 47 Harv. C.R.-C.L. L. Rev. 1, 18 (2012). The Court need not reach this issue because the Towns' claims may be sustained on the narrower ground that they are brought in the Towns' proprietary capacity. *See also* Josh Bendor, *Municipal Constitutional Rights: A New Approach*, 31 Yale L. & Pol'y Rev. 389, 426 (2013) (arguing against an expansive application of *Hunter* and observing that "[i]t would be a sad day in America if Texas could stop the residents of Austin from expressing their views on matters of state and national policy through their city council.").

*created it.*" *Rogers v. Brockette*, 588 F.2d 1057, 1069–70 (5th Cir. 1979) (emphases added).

The Supreme Court has acknowledged elsewhere that a municipality has distinct governmental and proprietary capacities. *See Owen v. City of Independence*, 445 U.S. 622, 644–45 (1980) (explaining that a municipality is "on the one hand . . . a corporate body, capable of performing the same 'proprietary' functions as any private corporation," and on the other hand, "an arm of the State."). And the U.S. District Court for the Southern District of New York, in addressing a claim brought by one New York municipality against another, has acknowledged that it is an "unresolved" and "interesting" question whether "the rule barring municipalities from bringing Fourteenth Amendment claims against one another would apply to a municipal corporation bringing a challenge in its proprietary—not its governmental—capacity." *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353, 364–65 (S.D.N.Y. 2000).

The District Court's grounds for dismissing *Owens* and *City of New Rochelle* as irrelevant are unpersuasive. The District Court distinguished *Owens* on the ground that it "dealt primarily with the extent to which a municipal corporation enjoyed protection from tort liability." (JA–78.) But a corporation's right to sue has long been recognized to go hand in hand with being subject to suit. *See, e.g.*, N.Y. Const. art. X, § 4; *County of Albany*, 204 N.Y. at 10

33

("[A]uthority *to sue and be sued as quasi corporations* has been restricted to the county [or town] in its corporate capacity as distinguished from its governmental and political capacity."). The District Court's grounds for distinguishing the scenario discussed in *City of New Rochelle* are similarly inapposite. (JA–79.) It makes little sense that a plaintiff municipality would have standing to bring a constitutional claim against another division of the state but not against the state itself.

This case squarely presents the issue of whether a municipality may bring a Fourteenth Amendment claim in its proprietary capacity and it shows why the Court should answer this question in the affirmative. The Towns' Fourth Amended Complaint plainly alleges that the Towns had brought claims in the State Court Action based on the injuries they suffered in their proprietary capacities. *See, e.g.*, JA–16, ¶ 4 ("Plaintiffs brought claims in their proprietary capacities against opioid producers and distributors: In other words, these claims were equivalent to the claims a private plaintiff can bring."); JA–22, ¶ 38 ("Plaintiffs' claims against the producer and distributor defendants included claims in the Plaintiffs' proprietary capacities. . . . Through their lawsuit, Plaintiffs

sought to recover damages to compensate them for their own financial harm.").[4]

There is nothing distinctly "governmental" about the claims the Towns brought against the opioid producer and distributor defendants to recover "money damages for the financial losses they had suffered as a consequence of the producers' and distributors' wrongdoing." (JA–16, ¶ 4.) In bringing these claims, the Towns were situated similarly to any private plaintiff that brings a claim to recover its own financial losses. The fact that the Towns' losses may have borne an indirect causal connection to activities they undertook in their governmental capacities is of no moment. The activities of a municipal corporation undertaken in its governmental and proprietary capacities are bound to have indirect causal relationships, but those relationships do not eclipse the distinction between

---

[4] None of the authority cited by the District Court or by the State in its briefing before the District Court addresses a claim brought by a municipality in its proprietary capacity. *See City of Trenton v. State of New Jersey*, 262 U.S. 182, 184–85 (1923) (rejecting argument that state statute requiring payment by municipalities for water diverted from rivers took "property owned by the city in its private or proprietary capacity for public use" and explaining that "[t]he power to determine the conditions upon which waters may be so diverted is a legislative function"); *Williams*, 289 U.S. at 37 (addressing claims arising from state statue exempting railroad company from taxation by municipalities); *Aguayo*, 473 F.2d at 1100 (addressing claim by New York City arising from its role in implementing a welfare program according to requirements imposed by the State of New York); *Kerr v. Polis*, 20 F.4th 686, 689 (10th Cir. 2021) (addressing claims that a Colorado statute requiring voter approval for tax increases deprived school districts and other political subdivisions, together with the people of Colorado, of a republican form of government).

governmental and proprietary capacities. Any damages the Towns recovered would be unrestricted funds, which they could use for any purpose they chose. Senate Bill No. 7194, however, purported to take away the Towns' valuable legal claims by State fiat—after the Towns had already devoted their energies and resources to bringing these claims.

This is precisely the kind of interference with the Towns' property rights that the City of Allegheny failed to allege in *Hunter*; *Hunter* and its progeny leave open the Towns' rights to pursue their claims in the proprietary capacities. The State's defense boils down to the proposition that the Supreme Court flatly rejected in *Gomillion*: that "the States have power to do as they will with municipal corporations regardless of consequences." 364 U.S. at 344. This Court should allow the Towns to pursue redress for the State's arbitrary gambit to pick winners and losers amongst the various State subdivisions that sought recovery for their own financial losses in the opioid epidemic.

## CONCLUSION

Plaintiff-Appellants respectfully submit that for the reasons set forth above, this Court should reverse the District Court's judgment and remand for further proceedings.

Dated: March 25, 2024       Respectfully submitted,

*/s/ Nathan A. Holcomb*
NATHAN A. HOLCOMB ESQ., PC
125 Park Avenue 25th Floor
New York, New York 10017
nholcomb@holcombpc.com
646.819.0303

Amos E. Friedland
Edward J. Normand
FREEDMAN NORMAND FRIEDLAND LLP
99 Park Avenue, Suite 1910
New York, New York 10016
afriedland@fnf.law
tnormand@fnf.law
646.970.7519

Mark A. Tate
TATE, GROSSMAN & KELLY
P.O. Box 9060
Savannah, Georgia 31412
tlgservice@tatelawgroup.com
912.234.3030

*Attorney for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the word limit of Local Rule 32.1(a)(4)(A) because, excluding the portions exempted by Fed. R. App. P. 32(f), this brief contains 8,554 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 25, 2024          */s/ Nathan A. Holcomb*