# 24-177

## United States Court of Appeals for the Second Circuit

---

TOWN OF BABYLON, NY, TOWN OF BROOKHAVEN,
TOWN OF HEMPSTEAD, NY, TOWN OF ISLIP, NY,
TOWN OF OYSTER BAY, TOWN OF NORTH HEMPSTEAD, NY,
TOWN OF HUNTINGTON, NY, TOWN OF RAMAPO, NY,
TOWN OF SMITHTOWN, NY,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, in her Official Capacity as the
Attorney General for the State of New York,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Eastern District of New York

---

### BRIEF FOR DEFENDANT-APPELLEE

---

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
STEPHEN J. YANNI
 *Assistant Solicitor General*
 *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Defendant-Appellee
28 Liberty Street
New York, New York 10005
(212) 416-6184

Dated: April 29, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT ................................................... 1

ISSUES PRESENTED ................................................................ 4

STATEMENT OF THE CASE .................................................. 4

    A.   New York's Efforts to Hold Drug Manufacturers and Distributors Accountable for the Opioid Crisis ........................ 4

    B.   Plaintiffs' Challenge to Mental Hygiene Law § 25.18(d) ....... 10

STANDARD OF REVIEW ...................................................... 12

SUMMARY OF ARGUMENT .................................................. 12

ARGUMENT ............................................................................. 15

POINT I .................................................................................... 15

  THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS LACK CAPACITY ............................................................................. 15

    A.   Municipal Corporations Lack Capacity to Bring Constitutional Challenges to State Statutes.......................... 16

    B.   This Action Does Not Qualify for the Proprietary-Interest Exception to New York's Capacity Rule. .................. 19

POINT II ................................................................................... 28

  THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS LACK STANDING ............................................................................. 28

    A.   Municipal Corporations Cannot Assert Fourteenth Amendment Claims Against the State.................................. 28

**Page**

B.    There Is No "Proprietary Capacity" Exception to the Restrictions on Municipal Standing. ...................................... 34

POINT III ...................................................................................... 39

THE DECISION BELOW CAN BE AFFIRMED ON ALTERNATE GROUNDS ...................................................................................... 39

A.    Plaintiffs Fail to Identify a Private Right of Action Authorizing This Suit. ............................................... 39

B.    Plaintiffs Fail to State a Claim for Relief Under the U.S. Constitution. ................................................. 41

1.    Plaintiffs fail to state a claim under the Petition Clause ........................................................ 41

2.    Plaintiffs fail to state a claim under the Equal Protection Clause ............................................. 43

3.    Plaintiffs fail to state a claim under the Due Process Clause. .............................................. 44

CONCLUSION ................................................................................ 46

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Aguayo v. Richardson,*
    473 F.2d 1090 (2d Cir. 1973) ....................................................... 3, 30

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) .................................................................... 39

*Aristy-Farer v. State,*
    143 A.D.3d 101 (1st Dep't 2016) ............................................. 19, 21

*Armstrong v. Exceptional Child Ctr.,*
    575 U.S. 320 (2015) .................................................................... 40

*Board of Levee Comm'rs of the Orleans Levee Bd. v. Huls,*
    852 F.2d 140 (5th Cir. 1988) ...................................................... 35

*Brass v. American Film Techs., Inc.,*
    987 F.2d 142 (2d Cir. 1993) ......................................................... 8

*Chevron Corp. v. Naranjo,*
    667 F.3d 232 (2d Cir. 2012) ................................................... 14, 39

*Christopher v. Harbury,*
    536 U.S. 403 (2002) ................................................................ 42-43

*Cine SK8, Inc. v. Town of Henrietta,*
    507 F.3d 778 (2d Cir. 2007) ........................................................ 44

*City of Charleston v. Public Service Comm'n of W. Va.,*
    57 F.3d 385 (4th Cir. 1995) ........................................................ 35

*City of Hugo v. Nichols,*
    656 F.3d 1251 (10th Cir. 2011) ................................................... 32

*City of New York v. Beretta U.S.A. Corp.,*
    524 F.3d 384 (2d Cir. 2008) .................................................. 14, 41-42

iii

**Cases**                                                    **Page(s)**

*City of New York v. Richardson,*
  473 F.2d 923 (2d Cir. 1973) .................................... 3, 11, 13, 30, 32, 38

*City of New York v. State,*
  86 N.Y.2d 286 (1995) ....................................... 12, 16-18, 20, 23-25, 27

*City of San Juan Capistrano v. California Pub. Utils. Comm'n,*
  937 F.3d 1278 (9th Cir. 2019) ............................................. 32

*City of Trenton v. New Jersey,*
  262 U.S. 182 (1923) .............................................. 14, 16, 29, 31, 34-36

*City of Worcester v. Worcester Consol. St. Ry.,*
  196 U.S. 539 (1905) ............................................................... 37

*Coleman v. Miller,*
  307 U.S. 433 (1939) ............................................................... 29

*Condell v. Bress,*
  983 F.2d 415 (2d Cir. 1993) .............................................. 41

*County of Albany v. Hooker,*
  204 N.Y. 1 (1912) ..................................................... 19, 22-23

*County of Rensselaer v. Regan,*
  80 N.Y.2d 988 (1992) ....................................................... 22

*Delta Special Sch. Dist. No. 5 v. State Bd. of Educ.,*
  745 F.2d 532 (8th Cir. 1984) ............................................. 32

*DeVillier v. Texas,*
  144 S. Ct. 938 (2024) ....................................................... 39

*Duke Power Co. v. Carolina Env't Study Grp., Inc.,*
  438 U.S. 59 (1978) ............................................................. 41

*Egbert v. Boule,*
  596 U.S. 482 (2022) ........................................................... 39

| Cases | Page(s) |
|---|---|

*Federal Defs. of N.Y., Inc. v. Federal Bureau of Prisons,*
954 F.3d 118 (2d Cir. 2020) .............................................................. 41

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.,*
991 F.3d 370 (2d Cir. 2021) ................................................... 12, 15, 26

*Garcia v. Wyeth-Ayerst Lab'ys,*
385 F.3d 961 (6th Cir. 2004) ............................................................. 42

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960) .................................................................. 31-32, 35

*Gulotta v. State,*
228 A.D.2d 555 (2d Dep't 1996) ...................................................... 25

*Hammond v. United States,*
786 F.2d 8 (1st Cir. 1986) .......................................................... 42, 46

*Hospital Ass'n of N.Y. State, Inc. v. Toia,*
577 F.2d 790 (2d Cir. 1978) ............................................................. 46

*Hunter v. City of Pittsburgh,*
207 U.S. 161 (1907) ................................................................... 28-29, 36

*Ileto v. Glock, Inc.,*
565 F.3d 1126 (9th Cir. 2009) .......................................................... 46

*In re National Prescription Opiate Litig.,*
976 F.3d 664 (6th Cir. 2020) ........................................................ 7, 44

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,*
846 F.3d 58 (2d Cir. 2017) ......................................................... 18, 21

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,*
892 F.3d 108 (2d Cir. 2018) ........................................................ 19, 21

*Inmates of Suffolk Cnty. Jail v. Rouse,*
129 F.3d 649 (1st Cir. 1997) ........................................................... 42

**Cases**                                                    **Page(s)**

*Kerr v. Polis,*
    20 F.4th 686 (10th Cir. 2021) ...................................................... 30, 32

*Logan v. Zimmerman Brush Co.,*
    455 U.S. 422 (1982) ........................................................................ 45

*Makarova v. United States,*
    201 F.3d 110 (2d Cir. 2000) ............................................................ 8

*Matter of Board of Educ. of Roosevelt Union Free Sch. Dist. v.*
    *Board of Trs. of State Univ. of N.Y.,*
    282 A.D.2d 166 (3d Dep't 2001) ..................................................... 21

*Matter of County of Cayuga v. McHugh,*
    4 N.Y.2d 609 (1958) ........................................................................ 17

*Matter of County of Seneca v. Eristoff,*
    49 A.D.3d 950 (3d Dep't 2008) ....................................................... 21

*Matter of Jeter v. Ellenville Cent. Sch. Dist.,*
    41 N.Y.2d 283 (1977) ...................................................................... 25

*Matter of World Trade Ctr. Lower Manhattan Disaster*
    *Site Litig.,*
    30 N.Y.3d 377 (2017) ........................................... 16-19, 21, 25, 28

*Meriwether v. Garrett,*
    102 U.S. 472 (1880) ........................................................................ 37

*Owen v. City of Independence,*
    445 U.S. 622 (1980) ........................................................................ 36

*Risty v. Chicago, R.I. & P. Ry. Co.,*
    270 U.S. 378 (1926) ........................................................................ 29

*Romer v. Evans,*
    517 U.S. 620 (1996) .................................................................... 32-33

**Cases**                                                                      **Page(s)**

*Slattery v. Hochul,*
   61 F.4th 278 (2d Cir. 2023) ............................................................. 13

*South Macomb Disposal Auth. v. Township of Washington,*
   790 F.2d 500 (6th Cir. 1986) ................................................. 32, 35-36

*Town of Ball v. Rapides Par. Police Jury,*
   746 F.2d 1049 (5th Cir. 1984) .......................................................... 32

*Town of Black Brook v. State,*
   41 N.Y.2d 486 (1977) ....................................................................... 24

*Trustees of Dartmouth Coll. v. Woodward,*
   17 U.S. 518 (1819) ............................................................................. 29

*Tweed-New Haven Airport Authority v. Tong,*
   930 F.3d 65 (2d Cir. 2019) ....................................................... 30-31, 33

*United States v. Amalfi,*
   47 F.4th 114 (2d Cir. 2022) .............................................................. 43

*Velez v. Levy,*
   401 F.3d 75 (2d Cir. 2005) ........................................................... 45-46

*Village of Arlington Heights v. Regional Transp. Auth.,*
   653 F.2d 1149 (7th Cir. 1981) .......................................................... 32

*Washington v. Seattle School District No. 1.,*
   458 U.S. 457 (1982) ..................................................................... 32-33

*Wayne Land & Min. Grp. LLC v. Delaware River Basin
   Comm'n,*
   894 F.3d 509 (3d Cir. 2018) ............................................................. 41

*Williams v. Mayor & City Council of Balt.,*
   289 U.S. 36 (1933) ............................................................................. 29

*Ysursa v. Pocatello Educ. Ass'n,*
   555 U.S. 353 (2009) ........................................................................... 29

## Constitution

U.S. Const. amend. I ................................................................ 41

## State Statutes

Ch. 190, 2021 N.Y. Laws ........................................................... 6

Mental Hygiene Law § 25.18 ........................................ 1, 6-7, 14, 43

N.Y. Em. Dom. Proc. Law §§ 501-514 ..................................... 27

N.Y. Gen. Mun. Law § 3 .......................................................... 27

N.Y. State Fin. Law § 99-nn ..................................................... 6

N.Y. Town Law § 2 ................................................................. 10

S.C. Code Ann. § 11-58-90 ...................................................... 8

## Miscellaneous Authorities

59 Am. Jur. 2d Parties § 28 (Westlaw updated through Feb. 2024) ...... 15

87 N.Y. Jur. 2d Public Funds § 21 (Westlaw updated through
        Apr. 2024) ................................................................... 26

Bill Jacket for ch. 190 (2021)
        Legislative Information (June 10, 2021) ............................. 6
        Sponsor Mem. to Senate Bill S7194 (June 10, 2021) ........................ 4-6

## PRELIMINARY STATEMENT

In 2019, the New York Attorney General brought one of the nation's most comprehensive lawsuits against opioid manufacturers and distributors to hold them to account for their contributions to the opioid crisis. After several years of hard-fought litigation, the Attorney General negotiated substantial settlements with many defendants. To facilitate these settlements, the New York State Legislature created a statewide settlement fund overseen by the Office of Addiction Services and Supports, established a board to evaluate the use of funds, and created guidelines for how funds should be allocated to ensure equitable access to abatement. The Legislature also barred cities, towns, and other political subdivisions from instituting separate civil actions against defendants who enter into statewide settlement agreements with the State, and extinguished any such actions that were filed after June 30, 2019. *See* Mental Hygiene Law (MHL) § 25.18(d).

Plaintiffs-appellants are nine towns incorporated under New York law who had filed claims against opioid manufacturers and distributors after June 30, 2019, but prior to the passage of MHL § 25.18(d). Plaintiffs seek declaratory and injunctive relief against the Attorney General on

the ground that MHL § 25.18(d)'s retroactive extinguishment of their claims purportedly violated the federal and state constitutions. The U.S. District Court for the Eastern District of New York (Matsumoto, J.) dismissed the complaint because plaintiffs are municipal corporations who lack capacity and standing to assert federal constitutional challenges to state legislation and declined to exercise supplemental jurisdiction over the remaining state-law claims.

This Court should affirm. First, the district court correctly held that plaintiffs lack capacity under state law to challenge MHL § 25.18(d). New York law governing the capacity of a party to sue in state and federal courts prohibits municipal corporations from challenging the constitutionality of state legislation. Contrary to plaintiffs' argument, they cannot invoke the proprietary-interest exception to New York's capacity rule. That exception allows a municipal corporation to challenge a state law that adversely affects its vested interest in a specific fund designated by statute. Plaintiffs' inchoate interest in potential recoveries from unadjudicated causes of action is insufficient to satisfy this narrow exception.

Second, the district court correctly ruled that plaintiffs lack standing to assert their constitutional challenges against the State. As

2

this Court has long held, "[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973); *see Aguayo v. Richardson*, 473 F.2d 1090, 1100-01 (2d Cir. 1973). Here, each of plaintiffs' federal constitutional claims against the State explicitly or necessarily arises under the Fourteenth Amendment. Contrary to plaintiffs' assertions, the Supreme Court has never disturbed the holdings on which *City of New York* and *Aguayo* relied. Indeed, every federal court of appeals to have addressed the question has agreed that a municipal corporation may not invoke the Fourteenth Amendment against its parent State. Nor is there any legal authority for plaintiffs' argument that they may nonetheless assert such claims in a proprietary, as opposed to governmental, capacity.

Finally, even if this Court were to conclude that plaintiffs established both capacity and standing, the judgment below should be affirmed on various alternative grounds raised below but not reached by the district court. Plaintiffs have failed to identify a private right of action authorizing them to sue the Attorney General in federal court, and in any event, the complaint fails to state a claim on which relief can be granted.

## ISSUES PRESENTED

1. Whether the district court correctly held that plaintiffs lack capacity under state law to raise constitutional challenges to MHL § 25.18(d).

2. Whether the district court correctly held that plaintiffs lack standing to raise Fourteenth Amendment challenges to MHL § 25.18(d).

3. Whether the district court's dismissal of the complaint may be independently affirmed because plaintiffs failed to identify a private right of action authorizing this suit or to state a claim for relief.

## STATEMENT OF THE CASE

### A. New York's Efforts to Hold Drug Manufacturers and Distributors Accountable for the Opioid Crisis

Over the last thirty years, the State of New York, like much of the country, has been ravaged by the opioid crisis. In addition to a devastating loss of human life, the opioid crisis has imposed other serious "human and financial impacts," ranging "from the increased need for treatment services to an expansion in criminal, legal and child welfare systems involvement." Sponsor Mem. to Senate Bill S7194 (June 10, 2021), in Bill Jacket for ch. 190 (2021), at 8.

4

Among the central causes of the opioid overdose epidemic was the exponential increase in opioid prescriptions beginning in the 1990s. "Yet, for years, the corporations that manufactured, distributed, and sold these drugs willfully ignored or misrepresented the impact of these medications and the extent of the problem." *Id.* (*See* Joint Appendix (J.A.) 18-20.) New York, as well as many other States and localities, brought lawsuits and enforcement actions against manufacturers and distributors of opioids to hold these corporations to account and "to address the huge budgetary impact of the substance use disorder problems that they helped to cause." Sponsor Mem. to Senate Bill S7194, *in* Bill Jacket, *supra*, at 8.

In March 2019, the New York Attorney General initiated one such lawsuit against multiple opioid manufacturers and distributors alleging numerous violations of state law. *See* First Am. Compl., *New York v. Purdue Pharma, L.P.*, No. 400016/2018 (Sup. Ct. Suffolk Cnty. Mar. 28, 2019), NYSCEF No. 15. The Legislature recognized that New York could recover millions of dollars through its litigation efforts and determined to ensure that the resources it obtained would be used to address the

harms occasioned by the crisis. Sponsor Mem. to Senate Bill S7194, *in* Bill Jacket, *supra*, at 8.

To that end, the Legislature unanimously enacted Senate Bill S7194 in June 2021.[1] Ch. 190, 2021 N.Y. Laws (LRS) (S. 7194 *reproduced at* J.A. 32-39). First, the law established an opioid settlement fund segregated from the State's general fund. *See* N.Y. State Fin. Law § 99-nn. Second, the Legislature established an advisory board under the Office of Addiction Services and Supports and specified the manner in which the recovered funds may be spent, directing a focus on public-health education; substance-use prevention, treatment, and recovery programs; housing services; and other community-based initiatives. MHL § 25.18(a), (c). The Legislature further provided that funds would be "distributed regionally and in accordance with the statewide opioid settlement agreements to ensure adequate geographic disbursement across the state." *Id.* § 25.18(b)(1).

---

[1] The legislators who voted unanimously to pass this bill include those representing the plaintiff towns. *See* Legislative Information (June 10, 2021), *in* Bill Jacket, *supra*, at 3-4 (Senate and Assembly vote tallies).

6

Third, and as relevant to this case, the Legislature barred political subdivisions such as counties, cities, and towns from asserting claims against opioid defendants who entered into statewide settlement agreements with the State. MHL § 25.18(a)(2), (d). (*See* J.A. 16, 23.) Specifically, MHL § 25.18(d) precludes political subdivisions from asserting future claims against settling opioid defendants and extinguishes any such claims that were brought by political subdivisions after June 30, 2019.[2] *Id.* § 25.18(d). In passing MHL § 25.18(d), the Legislature sought to maximize recoveries for the State and its residents because under the terms of the statewide settlements, the amount recovered by the State increases depending on how many political subdivisions' claims are

---

[2] The June 30, 2019, cutoff date aligns with the timeline of the national multidistrict litigation (MDL) involving claims brought against opioid manufacturers and distributors. Specifically, on June 14, 2019, the executive committee for the MDL plaintiffs moved to certify a "negotiation class" including "every city and county within the United States . . . unless a prospective class member exercised its right to opt-out within sixty days of class certification." *In re National Prescription Opiate Litig.*, 976 F.3d 664, 667 (6th Cir. 2020). The cutoff served to extinguish the multitude of claims filed by political subdivisions after the motion for a negotiation class was made. *See, e.g.*, Settling Distributors' Mot. to Dismiss, Ex. C., Ltr. from N.Y. Special Counsel, *In re National Prescription Opioid Litig.*, No. 1:17-md-02804 (N.D. Ohio Apr. 27, 2022), ECF No. 4398-3 (listing dozens of subdivisions which asserted claims after cutoff).

7

released (whether by operation of statute or execution of releases).[3] (J.A. 43-44.) At least twelve other States enacted analogous provisions limiting the authority of political subdivisions to assert or maintain claims against settling opioid defendants. (J.A. 41-43 (listing eleven analogous statutes).) *See also* S.C. Code Ann. § 11-58-90.

Following the enactment of MHL § 25.18, the Attorney General entered into numerous statewide opioid settlements, including (i) a $1.1 billion settlement with the three largest opioid distributors (McKesson, Cardinal Health Inc., and Amerisource Bergen Drug Corporation (now Cencora)); (ii) a $260 million settlement with opioid manufacturer Janssen, a subsidiary of Johnson & Johnson; (iii) a $200 million settlement with opioid producer Allergan; (iv) a $523 million settlement with opioid manufacturer Teva; (v) a $221 million settlement with chain pharmacy CVS; (vi) a $237 million settlement with chain pharmacy

---

[3] In determining a motion to dismiss under Rule 12(b)(1), the Court "may refer to evidence outside the pleadings." *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Similarly, the Court properly considers under Rule 12(b)(6) documents which are incorporated by reference into the complaint or "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit," *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993), such as the statewide settlement agreements (J.A. 23-25).

Walgreens; and (vii) a $138 million settlement with chain pharmacy Walmart. (J.A. 43-44.) Direct payments are to be made by the settling defendants to all counties within the State and to the six largest cities by population (New York City, Buffalo, Rochester, Yonkers, Syracuse, and Albany). The Legislature will appropriate the remaining funds to address opioid abatement. (J.A. 44-45.) Even if a specific subdivision does not receive a direct payment from the settlement fund, it may qualify for a distribution from the county in which it is situated, and its residents will benefit from the county's opioid treatment and prevention programs. (J.A. 45.)

**B.      Plaintiffs' Challenge to Mental Hygiene Law § 25.18(d)**

Plaintiffs are nine incorporated towns located in Nassau, Suffolk, and Rockland counties.[4] (J.A. 17-18.) Plaintiffs commenced a lawsuit in December 2019 against various opioid manufacturers and distributors. (J.A. 22.) It is undisputed that MHL § 25.18(d) extinguished plaintiffs' claims against those defendants who had entered into statewide opioid settlements with the State. (J.A. 23-24.)

In March 2022, plaintiffs brought this action against the Attorney General in the U.S. District Court for the Eastern District of New York. (J.A. 6, 15.) In addition to various state-law claims, plaintiffs asserted that MHL § 25.18(d) violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Petition Clause of the First Amendment of the U.S. Constitution. (J.A. 25-26.) As relief, plaintiffs sought a declaratory judgment and an injunction against the Attorney General's enforcement of MHL § 25.18(d). (J.A. 29.)

---

[4] Under New York law, a town is "a municipal corporation comprising the inhabitants within its boundaries, and formed for the purpose of exercising such powers and discharging such duties of local government and administration of public affairs as have been, or, may be conferred or imposed upon it by law." N.Y. Town Law § 2.

In December 2023, the district court granted the Attorney General's motion to dismiss the operative complaint. (J.A. 54.) First, the court held that, as municipal corporations, plaintiffs lack capacity under New York law to assert a constitutional challenge to state statutes. (J.A. 62.) And plaintiffs failed to establish that "they are vested with an entitlement to a specific fund by a statute," as required to qualify for the proprietary-interest exception to the capacity rule. (J.A. 69 (quotation marks omitted).)

Second, the court held in the alternative that plaintiffs lacked standing, citing to this Court's holding in *City of New York* that "[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." 473 F.2d at 929. (J.A. 76.) The court also determined that no legal authority supported plaintiffs' attempt to "evade" *City of New York* by arguing that they may assert claims in a proprietary, as opposed to governmental, capacity. (J.A. 78.)

The court declined to exercise supplemental jurisdiction over plaintiffs' state law claims (J.A. 80-84), and dismissed the complaint with prejudice, because plaintiffs had four opportunities to amend, including

11

an opportunity to respond to an earlier dismissal based on lack of capacity (J.A. 86-87).

## STANDARD OF REVIEW

This Court reviews de novo the dismissal of a complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or failure to state a claim under Rule 12(b)(6). *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 379 (2d Cir. 2021).

## SUMMARY OF ARGUMENT

I. New York law strictly limits when political subdivisions such as municipal corporations may sue the State. In general, municipal corporations lack capacity to challenge the constitutionality of state legislation. *City of New York v. State*, 86 N.Y.2d 286, 289 (1995). Plaintiffs miss the mark in invoking the proprietary-interest exception to the capacity rule, which allows municipal entities to challenge state laws that adversely affect a vested statutory interest in a specific fund. *See id.* at 291-92. Plaintiffs have no interest in a specific, ascertainable fund, and their asserted interest in potential recoveries associated with unadjudicated causes of action does not suffice. And no law supports plaintiffs' sugges-

12

tion that the narrow proprietary-interest exception allows municipal corporations to sue based on *any* proprietary interest affected by a state statute.

II. Plaintiffs also lack standing to bring this action. Plaintiffs' federal claims all arise under the Fourteenth Amendment, either explicitly (substantive due process and equal protection) or necessarily (the First Amendment is made applicable to the States by the Fourteenth Amendment).[5] It is well settled that "[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." *E.g.*, *City of New York*, 473 F.2d at 929. Contrary to plaintiffs' assertions, the Supreme Court has not cast doubt on this established principle. Indeed, every federal court of appeals to have addressed the question agrees that a municipal corporation may not invoke the Fourteenth Amendment against its parent State. And the Supreme Court has squarely rejected plaintiffs' argument that they may nonetheless

---

[5] *See Slattery v. Hochul*, 61 F.4th 278, 287 n.1 (2d Cir. 2023) ("The Supreme Court has held that the Fourteenth Amendment incorporates the protections of the First Amendment against state governments.").

assert such claims in their proprietary capacities. *See City of Trenton v. New Jersey*, 262 U.S. 182, 192 (1923).

III. In any event, the district court's dismissal of the operative complaint also can be affirmed on several alternative grounds raised below.

First, plaintiffs failed to identify a private right of action allowing this suit against the Attorney General in federal court. Although the complaint relies on the Declaratory Judgment Act, that statute does not confer a private right of action. *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 244-45 (2d Cir. 2012).

Second, plaintiffs have failed to state a claim for relief on any of their federal constitutional theories. The Petition Clause claim fails because the challenged statute does not impede plaintiffs' access to the courts but rather extinguishes their underlying causes of action, as a state legislature is entitled to do. *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008). The equal protection claim fails because the challenged statute easily satisfies rational basis review. As the complaint itself acknowledges, MHL § 25.18(d) was designed to facilitate the State's efforts to settle claims on a statewide basis against

14

opioid defendants. And the substantive due process claim fails because plaintiffs do not identify arbitrary or irrational government conduct that shocks the conscience.

## ARGUMENT

### POINT I

#### THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS LACK CAPACITY

The question of capacity addresses whether a party that "possesses an enforceable right may act as a litigant." *Fund Liquidation Holdings*, 991 F.3d at 382. Although capacity is "allied with . . . the question of standing," it is "conceptually distinct." *Id.* (quoting 59 Am. Jur. 2d Parties § 28). "The capacity to sue is the right to come into court; standing to sue, by contrast, is the right to relief in court." 59 Am. Jur. 2d Parties § 28 (Westlaw updated through Feb. 2024). Under Federal Rule of Civil Procedure 17(b), capacity is determined as a matter of state law.

The district court correctly concluded that plaintiffs failed to establish their capacity under New York law, which generally forbids municipal corporations from mounting constitutional challenges to state

15

legislation. Plaintiffs do not qualify for the proprietary-interest exception to this rule.

## A. Municipal Corporations Lack Capacity to Bring Constitutional Challenges to State Statutes.

"[T]he traditional principle throughout the United States has been that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York*, 86 N.Y.2d at 289. New York follows this rule and, as a general matter, "state entities lack capacity to challenge the constitutionality of a state statute." *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 383 (2017) (*World Trade Ctr. II*).

The capacity rule reflects the truism that "[t]he city is the creature of the State." *City of Trenton*, 262 U.S. at 190 (quoting *City of Worcester v. Worcester Consol. St. Ry.*, 196 U.S. 539, 549 (1905)). Cities, towns, and other municipal corporations "are merely subdivisions of the State, created by the State for the convenient carrying out of the State's govern-mental powers and responsibilities as its agents." *City of New York*, 86 N.Y.2d at 289-90. Municipal corporations thus owe their existence to "the

16

exercise of the power of the State through its legislative department." *Id.* at 290 (quoting *City of Trenton*, 262 U.S. at 189). And the Legislature may "at any time terminate the existence of the corporation itself, and provide other and different means for the government" of the territory within the former municipality's limits. *Id.* (quoting *City of Trenton*, 262 U.S. at 189-90); *see Matter of County of Cayuga v. McHugh*, 4 N.Y.2d 609, 614-15 (1958).

Given that municipal corporations' existence depends on the State, the New York Court of Appeals has recognized "the manifest improbability that the legislature would breathe constitutional rights into a public entity and then equip it with authority to police state legislation on the basis of those rights." *World Trade Ctr. II*, 30 N.Y.3d at 385 (citation and quotation marks omitted). To respect this legislative intent, New York courts exercise "extreme reluctance" before they will "intrude in the political relationships between the Legislature, the State and its governmental subdivisions." *City of New York*, 86 N.Y.2d at 296. Therefore, New York's capacity rule is "a necessary outgrowth of separation of powers doctrine." *Id.* at 295-96.

The New York Court of Appeals recognizes only four narrow exceptions to the capacity rule. *World Trade Ctr. II*, 30 N.Y.3d at 386-87. A municipal corporation has capacity to challenge the constitutionality of a state statute only where: (i) there is express statutory authorization for the suit, (ii) "the State legislation adversely affects a municipality's proprietary interest in a specific fund of moneys," (iii) "the State statute impinges upon the 'Home Rule' powers of a municipality" under the New York Constitution, or (iv) compliance with the statute would force the municipality to "violate a constitutional proscription." *City of New York*, 86 N.Y.2d at 291-92 (quotation marks omitted); *see also In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63-64 (2d Cir. 2017) (*World Trade Ctr. I*). Here, plaintiffs attempt to invoke only the proprietary-interest exception.[6] For the reasons explained below, plaintiffs fail to satisfy the stringent requirements for this exception.

---

[6] Plaintiffs argued below that the home-rule exception applies but have abandoned that argument on appeal. (*See* J.A. 70-75.)

18

**B.    This Action Does Not Qualify for the Proprietary-Interest Exception to New York's Capacity Rule.**

The proprietary-interest exception applies "where a public entity is 'vested with an entitlement to a specific fund by a statute' and the challenged statute adversely affects its interest in the fund." *World Trade Ctr. II*, 30 N.Y.3d at 386 (quoting *Matter of Town of Moreau v. County of Saratoga*, 142 A.D.2d 864, 865 (3d Dep't 1988)). The relevant interest must "relate to funds or property of a municipal corporation in its possession or to which it had a right to immediate possession." *County of Albany v. Hooker*, 204 N.Y. 1, 16 (1912). The exception "does not apply where a municipality has 'a mere hope or expectancy' of receiving funds." *Aristy-Farer v. State*, 143 A.D.3d 101, 110 (1st Dep't 2016) (quoting *Matter of Board of Educ. of Roosevelt Union Free Sch. Dist. v. Board of Trs. of State Univ. of N.Y.*, 282 A.D.2d 166, 173 (3d Dep't 2001)), *aff'd as modified*, 29 N.Y.3d 501 (2017). And it is likewise insufficient for a municipal corporation to allege an indirect effect on its finances. *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 892 F.3d 108, 112 (2d Cir. 2018) (*World Trade Ctr. III*).

The New York Court of Appeals has rejected the argument that a proprietary interest unconnected to a specific fund may satisfy the

19

proprietary-interest exception. In *City of New York*, municipal plaintiffs asserted a constitutional challenge to the State's statutory scheme for school funding. 86 N.Y.2d at 289. In holding that the plaintiffs lacked capacity, the court emphasized that "they fail[ed] to point to any specific fund in which they are entitled to a proprietary interest." *Id.* at 295. The court, moreover, refused to further "erode" the capacity rule by expanding the exceptions it had recognized to date. *Id.* It explained:

> Finding a proprietary interest in the City of New York sufficient to confer capacity to sue without regard to a cognizable right in a specific fund would create a municipal power to sue the State in any dispute over the appropriate amount of State aid to a governmental subdivision or the appropriate State/local mix of shared governmental expenses. The narrow proprietary interest exception would then ultimately swallow up the general rule barring suit against the State by local governments.

*Id.* The specific-fund requirement is thus a critical safeguard against unwarranted inference in the political branches' management of state and local governmental affairs.

The Court of Appeals reaffirmed the specific-fund requirement in *World Trade Center II*. It explained that among the limited circumstances warranting a departure from the capacity rule is "where a public entity is vested with an entitlement to a specific fund by a statute and

the challenged statute adversely affects its interest in the fund." 30 N.Y.3d at 386 (quotation marks omitted). The court stressed the narrowness of the recognized exceptions and made no reference to an exception for proprietary interests unrelated to a specific fund. *See id.* at 387.

Consistent with this authority, New York courts have routinely rejected municipal corporations' capacity to assert claims based on speculative interests in unquantified funds. For example, the Appellate Division has found that municipal corporations lack capacity to challenge state statutes allocating school funds based on complex multi-variable formulas, *Aristy-Farer*, 143 A.D.3d at 110, or external factors such as daily attendance statistics, *Matter of Board of Educ. of Roosevelt Union Free Sch. Dist.*, 282 A.D.2d at 172-73, or to recover asserted shares of sales taxes that the State had not collected, *Matter of County of Seneca v. Eristoff*, 49 A.D.3d 950, 951 (3d Dep't 2008). This Court, too, has understood the proprietary-interest exception to require showing an interest in a specific fund. *See World Trade Ctr. III*, 892 F.3d at 111; *World Trade Ctr. I*, 846 F.3d at 63. And it has rejected for lack of capacity challenges to laws that have "nothing to do with any fund." *World Trade Ctr. III*, 892 F.3d at 112.

21

Plaintiffs do not attempt to explain how they satisfy the specific-fund requirement. On appeal, plaintiffs fully retreat from their argument to the district court that their interest in unadjudicated causes of action is tantamount to a vested interest in a specific fund under *County of Rensselaer v. Regan*, 80 N.Y.2d 988 (1992). (*See* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss at 12-14 (May 12, 2023), ECF No. 52.) The district court correctly rejected this argument, explaining that *County of Rensselaer* involved a specific fund in which participating counties had an express statutory entitlement, as New York law requires, while plaintiffs "had only unadjudicated legal claims . . . that may or may not have resulted in monetary recovery." (J.A. 66 (quotation marks omitted).)

Plaintiffs instead ask this Court to expand the proprietary-interest exception to encompass *any* proprietary interest, citing the New York Court of Appeals' decision in *County of Albany v. Hooker*, 204 N.Y. 1 (1912). *See* Br. for Pls.-Appellants (Br.) at 20-24. Plaintiffs' argument misconstrues *Hooker* and ignores New York courts' clear and consistent articulation of the proprietary-interest exception during the intervening century since that case was decided.

22

*Hooker* involved a challenge to a state law appropriating funds for highway improvements. 204 N.Y. at 7-8. The plaintiff county argued that the appropriation violated the New York Constitution, which required such funds to be apportioned equitably among the counties. *Id.* at 5-9. In ruling that the county lacked standing to assert this constitutional challenge, the court explained that it had recognized a municipal corporation's capacity to challenge state statutes only where they "relate to funds or property . . . in its possession or to which it had a right to immediate possession." *Id.* at 16. Yet the county's challenge involved no proprietary interest at all but merely a desire that the funds be spent for the benefit of its residents. *Id.* at 17. The court's recognition of this fact did not amount to a holding that *any* proprietary interest would have sufficed to establish capacity, as plaintiffs assert. *See* Br. at 17-18.

To the contrary, the Court of Appeals has expressly declined to adopt such a rule in the decades since *Hooker* was decided. In *City of New York*, the court refused to hold that the capacity rule is limited to cases involving "statutory restrictions on a municipality's power" or certain types of forced expenditures. 86 N.Y.2d at 293. But that is precisely what plaintiffs contemplate in arguing that the capacity rule applies only to

23

claims challenging the restriction of governmental powers. *See* Br. at 16, 18-19. While plaintiffs correctly note (Br. at 19) that a municipality lacks capacity to challenge a state law "restricting its governmental powers," *Town of Black Brook v. State*, 41 N.Y.2d 486, 488 (1977), those are not the *only* claims subject to the capacity rule. The rule also applies to bar claims involving asserted proprietary interests unrelated to any fund. See *supra* at 19-21.

There is no basis for plaintiffs' contention that demonstrating a statutory entitlement to a specific fund is "sufficient" but not "necessary" to satisfy the proprietary-interest exception. Br. at 20. *City of New York* explained that a municipal plaintiff asserting "a proprietary interest in a fund or property" must satisfy "the criteria set in *Matter of Town of Moreau v. County of Saratoga* and *County of Rensselaer v. Regan*"— decisions of the Appellate Division which required demonstrating "a cognizable right in a specific fund." 86 N.Y.2d at 295 (citations omitted). Plaintiffs are thus wrong that the specific-fund requirement is a stubborn "artifact" of *Matter of Town of Moreau* that is otherwise unmoored from the governing legal framework. *See* Br. at 20. The opposite is true: The Court of Appeals has expressly identified the specific-fund requirement

24

as a criterion for invoking the proprietary-interest exception. *See City of New York*, 86 N.Y.2d at 295.

Plaintiffs' sprawling conception of the proprietary-interest exception also cannot be squared with the numerous precedents finding no capacity across a "wide[] variety of State actions having differing adverse impacts on local governmental bodies and their constituents." *See City of New York*, 86 N.Y.2d at 293. In particular, New York courts routinely dismiss for lack of capacity challenges to state mandates requiring municipal entities to expend funds. *See, e.g.*, *Gulotta v. State*, 228 A.D.2d 555, 556 (2d Dep't 1996); *Matter of Jeter v. Ellenville Cent. Sch. Dist.*, 41 N.Y.2d 283, 287 (1977). Thus, it cannot be the case that a municipal corporation has capacity to mount a constitutional challenge to any state law that deprives it of any proprietary interest whatsoever. Yet plaintiffs do not say what limits, if any, apply to the proprietary claims they may assert.

Nor do plaintiffs derive support from their "generic grant of authority to sue or be sued." *See World Trade Ctr. II*, 30 N.Y.3d at 386 (quotation marks omitted). Under New York law, "[c]apacity is examined with a view towards the relief sought, which means that the same party may have capacity to bring one kind of claim but not another." *Id.* at 386

25

n.3 (citation and quotation marks omitted). Plaintiffs are therefore mistaken to suggest that a ruling that they lack capacity in this case is at odds with their power as corporations to sue and be sued. *See* Br. at 22. That power is a function of plaintiffs' corporate existence, which is a matter separate and apart from their capacity to assert a particular cause of action against the State. *See, e.g.*, *Fund Liquidation Holdings*, 991 F.3d at 382-84.

Similarly, none of plaintiffs' speculative hypotheticals (Br. at 22-23) is persuasive. For example, plaintiffs argue that adhering to the specific-fund requirement would deprive a city of recourse if the State were to seize all its bank accounts. Br. at 22. But a city's bank accounts comprise specific funds to which the city has an immediate right of possession, and there is extensive statutory authorization to maintain municipal funds for various purposes, bringing this hypothetical comfortably within the proprietary-interest exception. *See generally* 87 N.Y. Jur. 2d Public Funds § 21 (Westlaw updated through Apr. 2024). Plaintiffs also assert that, if the decision below is affirmed, they would not be able to challenge a law that transfers real property from a municipal corporation to the State. Br. at 22-23. However, the Legislature has expressly authorized

26

suits against the State "[w]here property of a municipal corporation . . . is taken in the exercise of the power of eminent domain for a purpose substantially different from that for which it is held by such municipal corporation." N.Y. Gen. Mun. Law § 3; *see* N.Y. Em. Dom. Proc. Law §§ 501-514.

Finally, as a matter of comity, this Court should exercise extreme caution in adopting expansive interpretations of state-law capacity doctrines as a general matter, and especially in this case. The State has been tasked with apportioning access to a limited pool of opioid settlement funds and its policy decision to extinguish certain claims as a means of maximizing recovery for the State required the careful balancing of competing interests including "the political relationships between the Legislature, the State and its governmental subdivisions." *See City of New York*, 86 N.Y.2d at 296. Upsetting that careful balance by allowing plaintiffs' claims to proceed would threaten the settlements the State has achieved and the statewide benefits they provide.

## POINT II

### THE DISTRICT COURT CORRECTLY HELD
### THAT PLAINTIFFS LACK STANDING

**A. Municipal Corporations Cannot Assert Fourteenth Amendment Claims Against the State.**

The district court correctly ruled that plaintiffs' claims fail for an additional and independent reason: each of plaintiffs' federal constitutional claims arises either explicitly or necessarily under the Fourteenth Amendment, and plaintiffs lack standing to bring such challenges against the State and its officers.[7]

In *Hunter v. City of Pittsburgh*, the U.S. Supreme Court observed that the nature and extent of the powers conferred on municipal corporations, including the power to hold property, "rests in the absolute discretion of the state." 207 U.S. 161, 178 (1907). Thus, the State may withdraw power or property from municipal corporations, or destroy the

---

[7] Plaintiffs are incorrect (Br. at 24) that there is complete overlap between the capacity inquiry under state law and the standing inquiry under federal law. Although New York's capacity rule is "derived from" the U.S. Supreme Court's decision in *Hunter v. City of Pittsburgh*, 207 U.S. 161 (1907), the New York Court of Appeals has expressly reserved the question of whether and to what extent New York law recognizes the exceptions to *Hunter*'s general rule that other jurisdictions have identified. *World Trade Ctr. II*, 30 N.Y.3d at 386 n.4.

corporation altogether, "unrestrained by any provision of the Constitution of the United States." *Id.* at 178-79; *see Trustees of Dartmouth Coll. v. Woodward*, 17 U.S. 518, 629-30 (1819) (Marshall, J.).

In the years following *Hunter*, the Supreme Court reiterated that "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunity under the Federal Constitution which it may invoke in opposition to the will of its creator." *Williams v. Mayor & City Council of Balt.*, 289 U.S. 36, 40 (1933); *accord Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009). And, as relevant here, the Supreme Court has held that municipal corporations lack standing to sue the State for alleged violations of the Fourteenth Amendment, including the due process and equal protection clauses. *See Williams*, 289 U.S. at 40 (equal protection); *City of Trenton*, 262 U.S. at 188 (due process).[8] This Court has similarly held that "[p]olitical subdivisions of a

---

[8] *See also Coleman v. Miller*, 307 U.S. 433, 441 (1939) ("Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator."); *Risty v. Chicago, R.I. & P. Ry. Co.*, 270 U.S. 378, 390 (1926) ("The power of the state and its agencies over municipal corporations within its territory is not restrained by the provisions of the Fourteenth Amendment.").

state may not challenge the validity of a state statute under the Fourteenth Amendment." *City of New York*, 473 F.2d at 929; *see Aguayo*, 473 F.2d at 1100-01.

Contrary to plaintiffs' assertions, *Williams*, *City of Trenton*, *City of New York*, and *Aguayo* remain good law and control this case. This Court confirmed in *Tweed-New Haven Airport Authority v. Tong* that it is the law of the circuit "that a political subdivision does not have standing to sue its state under the Fourteenth Amendment." 930 F.3d 65, 73 n.7 (2d Cir. 2019).[9] In *Tweed*, this Court considered whether a political subdivision may assert a federal preemption claim against a State under the Supremacy Clause. *See id.* at 73. In concluding that a political subdivision may assert such a claim, this Court expressly distinguished cases like this one in which a political subdivision seeks to "assert its own rights under the Fourteenth Amendment" against its parent State. *Id.* at 73 n.7. The Court explained that while federal preemption claims present "unique federalism concerns," these concerns are not present when a

_____

[9] The same result obtains regardless of whether, as some courts have determined, this issue is analyzed as a merits inquiry into whether plaintiffs have a cause of action as opposed to a question of Article III standing. *Cf. Kerr v. Polis*, 20 F.4th 686, 696 (10th Cir. 2021) (en banc).

political subdivision asserts its *own* constitutional rights. *See id.* at 73. The latter category of claims implicates a "different" set of considerations, *id.* at 73 n.7, including the inherent power of the State to control and organize its system of local government, *see City of Trenton*, 262 U.S. at 186-87.

Plaintiffs are wrong to suggest (Br. at 28-30) that the Supreme Court repudiated its position on municipal standing in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). The plaintiffs in *Gomillion* were individual residents of a city whose bounds the State sought to alter. These individuals raised Fourteenth and Fifteenth Amendment challenges against the state action, arguing that the redrawing of municipal boundaries would infringe upon their voting rights. *Id.* at 340. In allowing plaintiffs' claims to proceed, the Court had no occasion to pass on whether the municipality itself could have challenged the state action. And notwithstanding the Court's observation that a State may not necessarily have "plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations," the Court reiterated that "the State's authority is unrestrained by the particular prohibitions of the Constitution considered in" *Hunter* and its

31

progeny. *Id.* at 344. Therefore, "*Gomillion* stands for the commonsense, limited proposition that a state's actions vis-a-vis municipalities may impact the rights of individuals living in the communities and that those impacted individuals are not denied the protections of the Constitution merely because the municipality is not contemplated by the constitutional provisions at issue."[10] *City of Hugo v. Nichols*, 656 F.3d 1251, 1259 (10th Cir. 2011).

Plaintiffs are equally wrong to rely on *Romer v. Evans*, 517 U.S. 620 (1996), and *Washington v. Seattle School District No. 1.*, 458 U.S. 457 (1982), to support their theory of standing. *See* Br. at 28-30. These cases involved both private and municipal plaintiffs, meaning that the

---

[10] This Court's decisions in *City of New York* and *Aguayo* both postdate *Gomillion*, and all federal circuit courts of appeals to have addressed the question after *Gomillion* agree that political subdivisions cannot raise Fourteenth Amendment challenges against the State. In addition to *City of New York v. Richardson*, 473 F.2d 923 (2d Cir. 1973), discussed above, see *Town of Ball v. Rapides Par. Police Jury*, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984); *South Macomb Disposal Auth. v. Township of Washington*, 790 F.2d 500, 504-05 (6th Cir. 1986); *Village of Arlington Heights v. Regional Transp. Auth.*, 653 F.2d 1149, 1152-53 (7th Cir. 1981); *Delta Special Sch. Dist. No. 5 v. State Bd. of Educ.*, 745 F.2d 532, 533 (8th Cir. 1984); *City of San Juan Capistrano v. California Pub. Utils. Comm'n*, 937 F.3d 1278, 1280-81 (9th Cir. 2019); *Kerr v. Polis*, 20 F.4th 686, 696 (10th Cir. 2021) (en banc).

32

Supreme Court had no reason to address (and did not address) the municipal plaintiffs' standing. *See Romer*, 517 U.S. at 625; *Washington*, 458 U.S. at 464. Moreover, in neither case did the municipal plaintiffs seek to vindicate their own constitutional rights; instead, they sought to assert the rights of their citizens against unlawful discrimination. *See Romer*, 517 U.S at 623-25; *Washington*, 458 U.S. at 464-65. Here, plaintiffs' claims against opioid defendants seek to recoup public funds they have expended in addressing the opioid crisis and bear no relation to their citizens' constitutional rights. As *Tweed* recognized, the unique concerns presented when a municipal corporation attempts to "assert its *own* rights under the Fourteenth Amendment" against the State independently justify the municipal corporation's lack of standing to pursue such claims. *See* 930 F.3d at 73 n.7 (emphasis added).

**B.    There Is No "Proprietary Capacity" Exception
to the Restrictions on Municipal Standing.**

There is no support for plaintiffs' alternative argument that they
may assert Fourteenth Amendment claims against the State in a
"proprietary capacity." As the district court correctly observed, plaintiffs
cite no authority that "differentiates between a political subdivision
suing its parent state in its 'proprietary capacity' as opposed to its
'governmental capacity.'" (J.A. 78.)

Indeed, the Supreme Court rejected an identical argument in *City
of Trenton*, which involved a local challenge to a state law imposing a
license fee on all corporations that diverted waterways for public water
supplies. 262 U.S. at 183-84. The plaintiff city claimed that the state law
unconstitutionally impaired its contract with the local waterworks, from
which the city had purchased the right to divert water as needed, and
that it took without just compensation or due process "property owned by
the city in its private or proprietary capacity." *Id.* As relevant here, the
Court held that the distinction between the city's governmental and
proprietary capacities "furnishe[d] no ground for the application of consti-
tutional restraints here sought to be invoked by the city." *Id.* at 192. The
Court further clarified that it had never held "any power, right, or

34

property of a city or other political subdivision . . . to be protected by the Contract Clause or the Fourteenth Amendment." *Id.* at 188. Nor had the Court held that "subdivisions may invoke such restraints upon the power of the state."[11] *Id.*

Consistent with *City of Trenton*, courts have rejected the "distinction between a municipal corporation acting in a governmental versus proprietary capacity" for purposes of assessing a municipal corporation's ability to sue the State. *South Macomb*, 790 F.2d at 505-06; *see City of Charleston v. Public Service Comm'n of W. Va.*, 57 F.3d 385, 388-89 (4th Cir. 1995); *Board of Levee Comm'rs of the Orleans Levee Bd. v. Huls*, 852 F.2d 140, 142 (5th Cir. 1988). Indeed, the proprietary-governmental distinction "has largely been abandoned as 'inherently unsound' in a variety of contexts." *South Macomb*, 790 F.2d at 505-06 (quoting *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955)).

---

[11] While plaintiffs rely (Br. at 32) on *Gomillion*'s observation that *Hunter* "intimates that a state legislature may not be omnipotent even as to the disposition of some types of property owned by municipal corporations," *Gomillion*'s discussion of this issue centered on the infringement of the property rights of third parties and not the city itself. 364 U.S. at 344-45.

In this respect, plaintiffs misplace their reliance on *Owen v. City of Independence*, 445 U.S. 622 (1980). As the district court observed, *Owen* "dealt primarily with the extent to which a municipal corporation enjoyed protection from tort liability." (J.A. 78 (citing *Owen*, 445 U.S. at 644-46).) Contrary to plaintiffs' assertion that this concept goes "hand in hand" with the right to sue (Br. at 33), *City of Trenton* expressly noted that the "most numerous illustrations" of the proprietary-governmental distinction can be found in cases involving questions of tort liability and yet found the distinction irrelevant for purposes of analyzing a municipal corporation's standing to sue the State, 262 U.S. at 191-92. *See also South Macomb*, 790 F.2d at 505-06 (rejecting municipal corporation's reliance on *Owen*).

Finally, even assuming that the law recognizes a distinction between a municipal corporation's governmental and proprietary capacities in this context, plaintiffs' asserted interests in recovering funds they have expended to combat the opioid crisis plainly involves property "held and used for governmental purposes." *See Hunter*, 207 U.S. at 179. Plaintiffs' alleged harm arises from increased expenditures related to "emergency medical services ('EMS'), fire departments, and police departments

36

operated by towns and villages."[12] (J.A. 20.) Specifically, plaintiffs argue that if their extinguished claims are not revived, they will have difficulty replacing EMS vehicles, recruiting employees and volunteers, purchasing medication and equipment, and handling other emergencies. (J.A. 25.) There is no plausible argument that the provision of these services to the public implicates private property that is "not charged with any public trust or use." *See Meriwether v. Garrett*, 102 U.S. 472, 513, 518 (1880) (contrasting public ownership of "streets, wharves, cemeteries, hospitals, court-houses, and other public buildings" with real property held "for profit or as a source of revenue"); *see also City of Worcester*, 196 U.S. at 551-52 (city had no enforceable property interest against the

---

[12] It is unclear how the complaint's "representative example" of this alleged harm implicates *any* municipal property interest. (*See* J.A. 20.) The Town of Brookhaven, the complaint alleges, provides EMS services through an independent "not-for-profit corporation staffed largely by volunteers." (J.A. 21.) While the Town allocates a portion of its property taxes to the nonprofit, it does not allege that the Town's own expenditures increased because of the opioid crisis. (*See* J.A. 20-21.) Instead, the complaint alleges that the nonprofit (which is not a plaintiff in this litigation) has incurred additional expenses and has had difficulty reallocating its resources. (J.A. 21-22.) Plaintiffs do not explain how they have standing to vindicate the property interests of a third-party nonprofit organization.

State arising from city's contract with railroad company, entered in service of "the public welfare").

Plaintiffs respond by arguing that because "any private plaintiff" may bring claims to recover for financial losses there is nothing inherently "governmental" about their claims against opioid producers and distributors. Br. at 35. But this reasoning immediately breaks down under scrutiny. In *City of New York*, for example, both individual and municipal plaintiffs asserted a constitutional challenge to state public-assistance laws. 473 F.2d at 925. The individual plaintiffs had standing to assert the constitutional challenge, while the municipal plaintiffs did not. *See id.* at 929-32. Allowing municipal corporations to assert claims merely because they could be brought by "any private plaintiff" would completely swallow the rule prohibiting municipal corporations from asserting Fourteenth Amendment claims against the State.

38

# POINT III

## THE DECISION BELOW CAN BE AFFIRMED ON ALTERNATE GROUNDS

Should this Court determine, contrary to the principles set forth above, that plaintiffs have both standing and capacity to assert their federal constitutional claims, it may affirm on any of several alternative grounds raised below, but not decided by the district court.

## A. Plaintiffs Fail to Identify a Private Right of Action Authorizing This Suit.

"Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts." *DeVillier v. Texas*, 144 S. Ct. 938, 943 (2024). Instead, plaintiffs must ground their claims in a private right of action conferred by Congress. *See Egbert v. Boule*, 596 U.S. 482, 491 (2022); *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

Plaintiffs do not identify a private right of action authorizing this suit against the Attorney General. The complaint appears to rely on the Declaratory Judgment Act, 28 U.S.C. § 2201 (J.A. 29), but that statute does not itself create legal rights or provide a cause of action. *See Chevron Corp.*, 667 F.3d at 244-45. Although plaintiffs initially attempted to assert claims under 42 U.S.C. § 1983 (Second Am. Compl. ¶¶ 4, 30, 53-57

39

(Apr. 6, 2022), ECF No. 16), they amended their complaint to voluntarily withdraw those claims after the Attorney General explained that political subdivisions are not proper § 1983 plaintiffs (*see* Third Am. Compl. (Apr. 12, 2022), ECF No. 21; Ltr. from Andrew Amer, Special Counsel, to Hon. Kiyo A. Matsumoto at 3 (Apr. 7, 2022), ECF No. 17). Similarly, plaintiffs abandoned their erroneous attempt to rely on the Supremacy Clause for a cause of action. *See Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 324-25 (2015) (explaining that the Supremacy Clause "certainly does not create a cause of action"). (*See* Third Am. Compl. ¶ 33; J.A. 77 (noting that operative complaint does not rely on Supremacy Clause).)

Below, plaintiffs offered no meaningful response to the Attorney General's argument that they lacked a private right of action. Rather, plaintiffs asserted in a footnote with minimal elaboration that they need only demonstrate standing. (*See* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss at 19 n.5.) But no authority supports that proposition, and plaintiffs relied on inapposite cases that either expressly recognized the independent requirement of a right of action or did not address the issue

at all.[13] To assert a claim directly under the Constitution, plaintiffs would have needed to satisfy the requirements for invoking the court's equitable jurisdiction and grapple with the complicated questions that attend equitable claims. *See Federal Defs. of N.Y., Inc. v. Federal Bureau of Prisons*, 954 F.3d 118, 132-34 (2d Cir. 2020). But they have not attempted to do so and have thus forfeited any such argument.

## B. Plaintiffs Fail to State a Claim for Relief Under the U.S. Constitution.

### 1. Plaintiffs fail to state a claim under the Petition Clause.

The Petition Clause of the First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The right to petition "extends to all departments of government, including the courts." *Beretta*, 524 F.3d at 397 (quotation marks omitted).

---

[13] *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 71 (1978) (expressly declining to reach whether plaintiffs had right of action directly under Constitution); *Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 526 (3d Cir. 2018) (plaintiff had right of action under interstate compact); *Condell v. Bress*, 983 F.2d 415 (2d Cir. 1993) (not addressing the issue).

41

"The constitutional right of access [to the courts] is violated where government officials obstruct legitimate efforts to seek judicial redress." *Id.* (quoting *Whalen v. County of Fulton*, 126 F.3d 400, 406-07 (2d Cir. 1997)). But to suffer a First Amendment injury based on the denial of access to court, the plaintiff must have an underlying claim to assert. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). For this reason, the First Amendment right of access "is not violated by a statute that provides a complete defense to a cause of action or curtails a category of causes of action." *Beretta*, 524 F.3d at 397; *see Garcia v. Wyeth-Ayerst Lab'ys*, 385 F.3d 961, 967-68 (6th Cir. 2004); *Hammond v. United States*, 786 F.2d 8, 13 (1st Cir. 1986). "[W]hile there is a constitutional right to court access, there is no complementary constitutional right to receive or be eligible for a particular form of relief." *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997).

Plaintiffs allege that MHL § 25.18(d) violates their "First Amendment right to petition the courts to pursue their claims" against opioid producers and distributors. (J.A. 26.) But the statute does not impede or foreclose plaintiffs' "general use of the courts." *See Beretta*, 524 F.3d at 398. It merely "curtails a category of causes of action," *id.* at

42

397—namely, claims by political subdivisions against opioid producers and distributors commenced after June 30, 2019, that have been released in statewide settlements, MHL § 25.18(d). In extinguishing plaintiffs' underlying claims, the statute did not infringe upon plaintiffs' ancillary right to access the courts. *See Christopher*, 536 U.S. at 415.

### 2. Plaintiffs fail to state a claim under the Equal Protection Clause.

Plaintiffs concede that their equal protection challenge to MHL § 25.18(d) is subject to rational basis review. (*See* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss at 24-25.) Rational basis review is "extremely deferential" and "precludes second-guessing [the] wisdom, fairness, or logic of legislative choices." *United States v. Amalfi*, 47 F.4th 114, 125 (2d Cir. 2022) (quotation marks omitted).

Here, the law's rational basis is apparent from the face of the complaint. Specifically, the complaint alleges that New York enacted Senate Bill S7194 to facilitate a settlement with opioid producers and distributors. (J.A. 16, 23.) *See* Br. at 10. As explained above (at 7-8), the Legislature reasonably concluded that it was necessary to extinguish claims that would undermine the State's ability to achieve the level of

43

participation in statewide opioid settlements required to maximize recovery. The Legislature's selection of the June 30, 2019, cutoff date for extinguishment was rationally tied to the date when a motion was filed to certify a negotiation class in the MDL. The filing of that motion precipitated many claims by political subdivisions opting out of the negotiation class, and the Legislature reasonably concluded that the proliferation of local claims would be unmanageable and detrimental to the State's interest in maximizing recoveries through negotiating statewide settlements with opioid defendants.[14] See *supra* at 7 & n.2.

### 3. Plaintiffs fail to state a claim under the Due Process Clause.

To prevail on a substantive due process claim, a plaintiff must demonstrate that the defendant infringed on a valid property interest in an "arbitrary or irrational manner." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007). And to survive a motion to dismiss, a

---

[14] The Sixth Circuit's September 2020 reversal of the district court's certification of the negotiation class, *In re National Prescription Opiate Litig.*, 976 F.3d at 667, does not alter the fact that many lawsuits by political subdivisions followed the initial motion to certify the negotiation class in June 2019. For example, plaintiffs here commenced a lawsuit against various opioid defendants in December 2019. (J.A. 22.)

plaintiff "must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Plaintiffs do not satisfy these requirements.

A State is entitled to "create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily created causes of action altogether." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432 (1982). In these circumstances, "the State's interest in fashioning its own rules of tort law is paramount to any discernable federal interest" besides guarding against "state action that is wholly arbitrary or irrational." *Id.* at 433 (quotation marks omitted).

As explained above in relation to plaintiffs' equal protection claim (at 43-44), there was a clear rational basis for the State's release of plaintiffs' unadjudicated claims. The complaint does not come close to

alleging government conduct that is arbitrary or irrational—much less conduct that shocks the conscience.[15] *See Velez*, 401 F.3d at 93.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  New York, New York
       April 29, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Defendant-Appellee

By:   */s/ Stephen J. Yanni*
     STEPHEN J. YANNI
     Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
STEPHEN J. YANNI
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6184

---

[15] Nor may plaintiffs argue that MHL § 25.18(d) abridges vested rights in a manner that would limit the Legislature's discretion to extinguish their claims. A plaintiff's property interest in a cause of action vests no earlier than when a court reaches a judgment that is "final and unreviewable." *Hospital Ass'n of N.Y. State, Inc. v. Toia*, 577 F.2d 790, 796-97 (2d Cir. 1978); *see Ileto v. Glock, Inc.*, 565 F.3d 1126, 1141 (9th Cir. 2009); *Hammond*, 786 F.2d at 12.

46

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,999 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Emily Paule_